Anya Fuchs (State Bar # 215105)
Carasusana B. Wall (OH0090234) (*PHV Forthcoming*)
Tina Bullock (GA121791) (*PHV Forthcoming*)
Ameena Alauddin (OH 102588) (*PHV Forthcoming*)
**BULLOCK LEGAL GROUP LLC**
2000 Powell Street, Suite 825
Emeryville, California 94608
(833) 853-4258
(470) 412-6708 (facsimile)
anya@bullocklegalgroup.com
cara@bullocklegalgroup.com
tina@bullocklegalgroup.com
ameena@bullocklegalgroup.com

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| Lauren Phillips, as next friend and on behalf of D.P., a minor<br><br>                                    Plaintiff,<br><br>v.<br><br>ROBLOX CORPORATION, MICROSOFT CORPORATION, MOJANG AB, JOHN DOES 1-50, JOHN DOE CORPORATIONS 1-50,<br><br>                                    Defendants. | Case No.: 3:25-cv-10289<br><br>**COMPLAINT FOR DAMAGES**<br><br>1. **Strict Product Liability-Design Defect**<br>2. **Strict Product Liability-Failure to Warn**<br>3. **Negligent Design**<br>4. **Negligent Failure to Warn**<br>5. **Negligence-Ordinary**<br>6. **Intentional Misrepresentation**<br>7. **Negligent Misrepresentation**<br>8. **Fraud**<br>9. **Punitive Damages**<br><br>**DEMAND FOR JURY TRIAL** |

1.    Plaintiff D.P., by and through their next friend and parent Lauren Phillips, brings this Complaint and Demand for Jury Trial against Defendants Roblox Corporation, Microsoft Corporation, Mojang AB, John Does 1-50, and John Doe Corporations 1-50, to recover damages under the laws of the State of California arising from serious personal injuries, including physical, neurological, and psychological harms, caused by Plaintiff's prolonged and addictive use of Defendants' video game products (the "Products"). In support thereof, Plaintiff alleges and states as follows:

///

- 1 -

# I.    NATURE OF THE ACTION

2.    Modern video games that are the subject of this litigation are not traditional arcade-style video games. Instead, the video game products subject to this litigation are created with "operant conditioning" to weaponize a video game for the unethical, reckless, and/or negligent application of this psychological technique to encourage a negative response as to the gamer and the positive outcome of increased revenue for the defendants. This litigation seeks to hold each Defendant accountable for its use of behavioral modification systems for which it did not warn nor provide appropriate safeguards, instead exposing minors to the known risks associated with continuous and excessive video game product use for the sake of increased profits.

3.    Each Defendant enlisted licensed psychologists and psychiatrists to incorporate the Cognitive Behavior Therapy technique of operant conditioning into its video game products, thereby exposing minor children to psychological techniques without adequate warning, contrary to the standards applicable to those licensed mental health professionals that require informed consent.

4.    Each Defendant is aware that the behavior modification systems it uses results in continuous and excessive use of its video game products.

5.    Each Defendant is aware that continuous and excessive use of video game products increases its revenue, as the more time a player spends its products, the greater the likelihood that player will make in-game purchases.

6.    Each Defendant is also aware of the established science regarding video game addiction[1] and supporting that prolonged use of video games, particularly by minors, can result in detrimental physiological and psychological impacts that manifest in impaired brain development and function, cognitive decline, disordered behavior, and other physical and emotional deficits.[2]

7.    One such condition, Internet Gaming Disorder ("IGD") comes with a myriad of symptoms that include addiction, social isolation, depression, withdrawal symptoms that are often misdiagnosed as ADHD, exacerbation of ADHD and anxiety, all of which contribute to increased risk of suicide.

---

[1] MD Griffiths; Halley de Oliveira Miguel Pontes, *A History and Overview of Video Game Addiction*, The Oxford Handbook of Digital Technologies and Mental Health (Oct. 8, 2020) https://doi.org/10.1093/oxfordhb/9780190218058.013.2.

[2] Livny, Weinstein, and Weizman, *New Developments in Brain Research of Internet and Gaming Disorder,* 75 Neurosci.Biobehav. Rev. 314 (Apr. 2017)

8.   Defendants knew of the risks of IGD and the other accompanying medical conditions yet continued to market Minecraft and Roblox as "educational" despite being fully aware of these risks, and marketed their respective games and products to minors, even at most times without parental knowledge or consent in a school setting.

9.   Rather than mitigate the risks to minors, Defendants employed operant conditioning behavior modification systems and marketed their video game products to children without introducing safeguards such as parental controls, age verification, warnings, or limitations on time or money spent in-game.

10. While Defendants have profited from the addiction and disordered behavior caused by behavior modification systems they employ, generating billions of dollars of profits, the gamers – particularly minors- have been left to bear the burden of the damages resulting from this public health crisis.

11.  Minors exposed to Defendants' behavior modification systems not only experience physical and psychological effects but also endure the resulting consequences including worsened academic performance, social and familial relationships, employment prospects, and employability, among other things.

12.  Roblox, Minecraft, and the Xbox video game platform[3] (collectively "Products"), are often the first video game products children are exposed to, and thereby serve as the gateway, or catalyst, to the addiction cycle and disordered behavior.

13.  As set forth more fully below, Plaintiff D.P. has used Defendants' Products—including Roblox and Minecraft, among others—on various gaming systems, including Xbox, PlayStation, laptop computer, and Android phone. As foreseen and intended by each Defendant, Plaintiff's exposure to the behavior modification systems embedded within Defendants' products resulted in excessive and compulsive gameplay. This compulsive gameplay produced predictable and harmful physiological and psychological outcomes, leading to a disordered relationship with video games and the development of video game addiction.

---

[3] Hereinafter, "Xbox video game platform" collectively refers to all Xbox consoles (including Xbox 360, Xbox One, Xbox One S, and Xbox One X) and Xbox online game platforms (including the Xbox Network, Xbox Game Pass, Xbox Store, and Xbox Cloud Gaming).

14. Through this lawsuit, Plaintiff seeks to hold Defendants accountable for their respective conduct and design decisions that directly and proximately caused their addiction and the ongoing physical, neurological, psychological, and economic injuries he has suffered as a result.

## II.    PARTIES

15. Minor Plaintiff D.P. is, and at all times relevant to this action was, a citizen and resident of the State of Alabama.

16. D.P. is seven (7) years old and has been exposed to Defendants' video game products since early childhood.

17. Lauren Phillips is the next friend and parent of Plaintiff D.P., a citizen and resident of the State of Alabama whose principal place of residence is 414 White Plains Road Anniston, Alabama 36207.

18. Plaintiff began playing video games around the age of four (4). Over time, their gameplay included, among others, Minecraft and Roblox, with their usage escalating during adolescence and continuing to the present. Shortly after Plaintiff first used Defendants' Products, Plaintiff developed a disordered compulsion to continuously use the Products until that use ultimately developed into an addiction. As a result of this addiction, Plaintiff was injured and damaged by the conditions caused by Defendants' defective Products. Plaintiff currently plays Roblox and Minecraft on a phone, computer, and an Xbox. Plaintiff has historically engaged in gaming for extended daily periods, often more than 12 hours per day. Currently, Plaintiff games for 5-12 hours per day or more.

19. Plaintiff's video game use became disordered and addictive while a minor, with symptoms including but not limited to compulsive play, social isolation, and physical inactivity. Plaintiff continued to engage in excessive gaming, which exacerbated Plaintiff's physical and mental health conditions. Plaintiff's addiction has resulted in disabling injuries, including but not limited to depression, attention deficit hyperactivity disorder (ADD/ADHD), gamer's rage, anxiety, sleep issues, and psychological distress, interfering with their ability to attend school and participate in everyday life.

20. As a result of Defendants' conduct and the addictive and defective nature of their Products, Plaintiff has suffered—and continues to suffer—severe and ongoing injuries, including physical

impairment, neurological dysfunction, emotional and psychological harm, economic loss, and loss of quality of life.

21. Defendant Microsoft Corporation ("Microsoft") is a Washington corporation with its principal place of business at One Microsoft Way, Redmond, Washington 98052.

22. Microsoft is a video game developer and publisher that, at all times material hereto, designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Minecraft video game series and platform, either directly or indirectly, to members of the public within the State of Alabama, including to Plaintiff, and within the State of California.

23. At all times material hereto, Microsoft designed, developed, tested, patented, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold Minecraft products to members of the general public and educational institutions across the United States, including in the States of Alabama and California. At all relevant times hereto, Microsoft was vicariously responsible for the actions and omissions of its agents, servants, contractors, and employees acting within the course and scope of their respective agencies and employment relationships.

24. As of July 14, 1998, and continuing through the present, Microsoft is a foreign business corporation actively registered to do business in the State of California at registration no. 2826638.

25. Defendant Mojang AB ("Mojang") is a Swedish company with its principal place of business at Söder Mälarstrand 43, 118 25 Stockholm, Sweden.

26. Mojang is a video game developer and publisher that, at all times material hereto, designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Minecraft video game series and platform, either directly or indirectly, to members of the general public in the United States, including in the States of Alabama and California, and specifically to Plaintiff. At all relevant times hereto, Mojang was vicariously responsible for the actions and omissions of its agents, servants, contractors, and employees acting within the course and scope of their respective agencies and employment relationships.

27. In September 2014, Defendant Microsoft acquired Defendant Mojang and its intellectual property (including Minecraft) for $2.5 billion. Accordingly, Defendant Mojang is now a wholly owned subsidiary of Defendant Microsoft.

28. Although Mojang initially developed, sold, and maintained Minecraft, following its acquisition by Microsoft, both Microsoft and Mojang have played direct roles in changes made to the design, development, testing, assembly, manufacturing, publishing, publishing, packaging, labeling, preparation, distribution, marketing, supply, and/or sale the Minecraft video game series that Plaintiff began playing. Indeed, both Mojang and Microsoft are responsible for the addictive design features in Minecraft described herein. Both Mojang and Microsoft have direct liability for the harm and injuries caused by Minecraft based on their own conduct.

29. Defendant Roblox Corporation ("Roblox Corp.") is a Nevada corporation with its principal place of business at 3150 South Delaware Street, San Mateo, California 94403.

30. Roblox Corp. is a video game developer and publisher that, at all times material hereto, designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, and/or prepared Roblox at their California office. Roblox Corp. also distributed, marketed and/or supplied Roblox, either directly or indirectly, to members of the general public, including to California residents, as well as Alabama residents, including Plaintiff. At all relevant times hereto, Roblox Corp. was vicariously responsible for the actions and omissions of its agents, servants, contractors, and employees acting within the course and scope of their respective agencies and employment relationships.

31. Roblox Corp. performs the majority of its development, sales, executive, and other essential business functions from its primary office in San Mateo, California. Roblox has maintained significant contacts with the state of California since its conception, including maintaining its headquarters in California since 2006.

32. The true names and capacities of the Defendants, DOES 1 through 50 and JOHN DOE CORPORATIONS 1 through 50, are unknown to Plaintiff at the time of filing this Complaint. Plaintiff, therefore, sues said Defendants by fictitious names and will seek leave of court to amend this Complaint to state their true names and capacities when ascertained. Plaintiff is informed and

believes, and thereon alleges, that each of these fictitiously named Defendants is in some manner responsible for the occurrences alleged herein, and that Plaintiff's injuries and damages were proximately caused by the conduct of such Defendants.

### III.    JURISDICTION, VENUE, AND DIVISIONAL ASSIGNMENT

33. Plaintiff realleges and incorporates by reference all the foregoing allegations as if repeated in full here.

34. This suit alleges causes of action seeking relief under the laws of the State of California, including but not limited to the allegation that, as a direct and proximate result of the Defendants' Products and Defendants' negligent, deceptive, willful, immoral, reckless, and unlawful actions and omissions—including misrepresentations and failures to warn—Plaintiff has suffered and continues to suffer significant injuries and damages. Plaintiff has experienced harm and incurred damages in excess of $75,000, exclusive of interest and costs. These damages include harms caused by conduct that occurred, in part, in California, or was directed from and into the State of California by Defendants.

35. This Court has original subject matter jurisdiction over the claims pursuant to 28 U.S.C. § 1332(a) because the controversy is between citizens of different states and the amount in controversy exceeds $75,000.00.

36. This Court has general personal jurisdiction over Defendant Roblox Corp. because Roblox Corp. has its principal place of business in this District and because its continuous contact with this District renders it "at home" in this District. Defendant Roblox Corp. maintains its principal place of business in the San Mateo County, California.

37. This Court has specific personal jurisdiction over Defendants Microsoft and Mojang because they have each established sufficient minimum contacts in, to, or with California because each transacted business in California and regularly conducted business in California from which they respectively derive substantial revenue. Defendants do substantial business in the State of California and within the Northern District of California, advertise in this district, and receive substantial compensation and profits from their Products within this District. Furthermore, Defendants purposefully and intentionally directed their activities to the residents of California, and purposefully

and intentionally availed themselves to the benefits and protections of the laws of the state of California, and the market of the state of California, and continue to avail themselves in that manner. The controversy in this action is directly affiliated with, related to, and arises from Defendants' contacts with the state of California such that the exercise of jurisdiction over each Defendant by this Court is consistent with traditional notions of fair play and substantial justice and is both reasonable and proper.

38.  Each Defendant knew or reasonably should have known that its business activities, including the design and promotion of highly addictive video game products, would have consequences in the State of California and throughout the United States.

39.  Venue is proper in this District pursuant to 28 U.S.C. § 1391, because, among other things: (a) each Defendant directed its activities at residents in this District; (b) each Defendant conducted substantial business in this District; and (c) a substantial part of the counts giving rise to this action occurred in this District. For the same reasons, Divisional Assignment to San Francisco is appropriate.

## IV.    GENERAL FACTUAL ALLEGATIONS

### A.  OPERANT CONDITIONING AS A TRADITIONAL THERAPY

40.  The games subject to this litigation have incorporated "operant conditioning" which is a type of psychological treatment also called instrumental conditioning, is a learning process in which voluntary behaviors are modified by association with the addition (or removal) of reward or aversive stimuli. The frequency or duration of the behavior may increase through reinforcement or decrease through punishment or extinction.[4]



---

[4] https://en.wikipedia.org/wiki/Operant_conditioning

41. The American Psychological Association adopted a Code of Conduct that recognizes and requires that the Doctrine of Informed Consent is required to deploy operant conditioning and authorized legal consent is required and behavioral psychologists must take reasonable steps to protect a patient or subjects individual rights and welfare.[5]

42. Instrumental conditioning is psychological treatment traditionally used to address or treat excessive maladaptive behaviors that a patient wishes to extinguish such as smoking and overeating,[6] or alternatively to increase a behavior that is not occurring enough, such as eating enough, lack of focus to study and correcting lack of personal hygiene.

### 1.  Traditional Operant Conditioning

43.  Ethical use of operant conditioning, in compliance with the APA Code of Conduct is used to reduce unwanted and undesirable behaviors, such as eating disorders, chain smoking, and autism treatment to extinguish negative behavior.[7]

44.  The problem behavior is first observed and recorded as it naturally occurs in a variety of settings, and no attempt is made to modify the behavior. The therapist may conduct the observation and record the behavior. This part of the behavior modification program, is called baseline observation, provides a record of where and when the behavior occurred including duration and intensity. Behavioral measures are often plotted on a graph to provide a visual record of behavior. The baseline data are used to define the problem or target behavior as precisely as possible. The client and therapist also define the desired changes in this target behavior and set up specific behavioral goals to be met during treatment.

45.  This degree of precision in behavior analysis is rarely found in traditional psychotherapy. Behavioral observation continues throughout the treatment phase of the behavior modification program and changes from the baseline level are recorded. Examination of this ongoing record of behavioral progress allows both therapist and client to evaluate the effectiveness of the treatment

---

[5] American Psychological Association: Ethical Principles of Psychologists and Code of Conduct (adopted August 21, 2002 effective June 1 2003); chrome extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.apa.org/ethics/code/ethics-code-2017.pdf

[6] https://www.ebsco.com/research-starters/health-and-medicine/operant-conditioning-therapies

[7] *Id.*

throughout the treatment process. If behavior is not changing in the desired direction or pace, the treatment program can be altered or adjusted.

46. A licensed therapist must follow the applicable standards, including the APA Code of Conduct guidelines, in crafting an operant conditioning model to change a person's behavior which must include the informed consent of the subject patient that is having their own behavior modified.[8]

## 2. Defendants' Reckless, Negligent, and/or Unethical Application of Operant Conditioning

47. In contrast to traditional use of operant conditioning to extinguish negative behavior, the Defendants have utilized the unethical, reckless, and/or negligent behavioral psychologists to route of change human behavior by utilizing operant conditioning in game design to target the desired behavior of "Continuous Video Game Play" without informed consent of parents, schools or gamers in violation of the applicable standards, including the APA Code of Conduct.[9]

48. Ethical rules require knowledge, participation and informed consent of the subject whose behavior is being changed.

49. Defendants each employed licensed psychologists and/or psychiatrists to create operant conditioning behavior modification systems for their Products without warning that such psychological techniques were being used or of the risks associated with that use, failing to obtain meaningful informed consent to exposure to these systems.

50. The use of operant conditioning in gaming goes beyond increasing sales. Instead, the application of operant conditioning is used with the primary goal of increasing sessions and length of time of video game play. The goal was continuous game play to the detriment of gamers.

51. Defendants, with the assistance of unethical behavior therapists and psychologists, used beta versions of Minecraft and Roblox, with children as game testers to incorporate operant conditioning behavior modification systems into their Products' design to ensure the continuous play was achieved at game launch.

---

[8] American Psychological Association: Ethical Principles of Psychologists and Code of Conduct (adopted August 21, 2002 effective June 1 2003); chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.apa.org/ethics/code/ethics-code-2017.pdf

[9] *Id.*

52.  When an organization employs a behavioral psychologist, that psychologist still has a duty to do no harm.[10]

53.  The psychologist hired by the Defendants had a conflict between their applicable standards, including the APA Code of Conduct, because the Defendants used the assistant of psychologists to elicit the behavior of continuous game play, which did harm many gamers and no steps were taken to inform gamers of the operant conditioning, the targeted behavior or protect the gamers from the harm of video game addiction.

54.  APA Code of Conduct mandates that a conflict between organizational demands of a psychologists require acknowledgement of the conflict and "under no circumstances may this standard be used to justify or defend violating human rights.[11]

55.  Likewise, the duty of care owed by each Defendant precludes violating human rights or facilitating the violation of human rights, particularly to increase profit.

56.  Parents, gamers and schools are not aware that operant conditioning is being used on the players and no steps, such as disclosure of operant conditioning, disclosure that the targeted behavior was continuous play nor adequate tracking of game play hours was utilized in game design to protect gamers from the harm of addiction and the sequalae of addiction

57.  In sharp contrast to traditional uses of operant conditioning, the Defendants have used unethical, reckless, and/or negligent methods of creating negative maladaptive behaviors in children.

58.  The behaviors Defendants have sought to elicit do not pass muster under any applicable standards, including ethical standards binding on licensed therapists, because operant conditioning, intended to treat maladaptive behavior was instead twisted to create maladaptive behaviors.

59.  The traditional operant conditioning procedures were inverted so that the behavior of gamers was studied and recorded to create excessive maladaptive behaviors, including but not limited to video game addiction, impulsivity, decreased ability to focus in class, inability to track or conceptualize time spent in a video game, inability to finish tasks and prioritize important tasks, and

---

[10] American Psychological Association: Ethical Principles of Psychologists and Code of Conduct (adopted August 21, 2002 effective June 1 2003); chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.apa.org/ethics/code/ethics-code-2017.pdf
[11] *Id.*

increased social isolation leading to anxiety and depression,  increasing the suicide risk for extreme gamers.

60.  The behavior being reinforced in Minecraft and Roblox is continuous game play, which by ethical and social policy considerations is a negative behavior, especially in younger school-age children.

61.  Defendants monetarily incentivized the willing participation, and disregard of their ethical standards, of licensed psychologists in this reckless, negligent, and unethical abuse of treatment modality.

62.  Quoting an article published in the American Psychological Association:

> Psychologist Tim Nichols, PhD, loved video games as child. "Like any red-blooded American kid, I was playing on my Nintendo back in the 1980s and was a Sega guy in the '90s," he remembers. Now he gets paid to play. As "user research lead" at **Microsoft Studios**, Nichols is one of a growing number of psychologists in the video game industry. With the number of games and platforms exploding, companies that design and develop video games are increasingly turning to psychologists for help analyzing data and making sure their products are as effective as they can be. Some psychologists are even launching consulting businesses to assist game manufacturers or creating games of their own.[12]

63. As early as 2012, the American Psychology Association ("APA") embraced the income potential for their members and abandoned and disregarded their organizations own Code of Conduct by promoting the employment of psychologist for video game development to their members.

64.  Upon information and belief, the APA with full backing by the Defendants and the Entertainment Software Association ("ESA") supported suppression and identification of video game addiction instead opting to call the addiction "Internet Gaming Disorder." This patient abandonment has led to a lack of diagnosis and treatment for children suffering from video game addiction.

**B.  OPERANT CONDITIONING BEHAVIOR MODIFICATION SYSTEMS IN THE CONTEXT OF VIDEO GAME PRODUCTS**

**1.  Historical Development and Modernization of Video Games**

65.  Video games were first developed in or around the 1950s.

---

[12] https://www.apa.org/gradpsych/2012/01/hot-careers; Rebecca Clay Video Game Design and Development: Video Game Companies are increasingly tapping psychologists' expertise to make games even more compelling, challenging and fun. American Psychological Association

66.  Initially, games were only available to be played by the general public in arcades. Beginning in the 1970s, however, the first at-home video game devices ("consoles") appeared on the market.

67.  By the late 1990s and early 2000s, there were multiple at-home video game consoles, such as Xbox, PlayStation, and Nintendo's Wii, making video games easily accessible to most users from the comfort of their living room. Over the next ten years, video games moved to mobile devices and tablets, once again increasing accessibility to gameplay.

68.  Many video games – including Minecraft and Roblox– can now be played on multiple different consoles, mobile devices, and tablets.

69.  Moreover, video games can be delivered to these consoles, mobile devices, and tablets in several diverse ways, such as physical discs, digital downloads, school laptops, online gaming networks, and cloud gaming services.

70.  In 2024, there were 1.17 billion gamers online, and global gaming revenues are at least $176.06 billion.[13]

71.  As the sophistication of gaming devices and game delivery methods has increased, so too has the sophistication of the design of games themselves.

72.  Unlike their predecessors, many modern-day games are enormous in scale, providing countless hours of non-repetitive, unique gameplay that allows players to become immersed in the world of the game.

73.  The ways in which game developers monetize their games have also changed over time. In the past, game developers earned revenue primarily through the one-time sale of their games. Although some game developers still follow this model, others – including Defendants – allow their games to be downloaded for no or minimal cost and generate revenue through purchases made within the game.

74.  In-game purchases can include, but are not limited to, cosmetic customizations for the player's character (e.g., hats, uniforms, hair styles), "boosters" that help their character perform better

---

[13] Jasmine Katatikarn, *Online Gaming Statistics and Facts: The Definitive Guide (2024)*, Acad. of Animated Art (Jan. 16, 2024), https://academyofanimatedart.com/gaming-statistics/.

or progress faster within the game, and "season passes" that allow players to access exclusive in-game content.

75.  Many of these in-game purchases are relatively low cost, leading to them being termed "microtransactions."

76.  In-game items available for purchase are often heavily advertised to players through means such as in-game pop-up advertisements during gameplay, loading screens while users wait for gameplay to start, and in-game stores.

77.  Many games also offer game-branded products such as toys, energy drinks, apparel, bedding, home goods, board games, and more.

78.  Game developers that offer their games at no or low cost, such as Roblox, and Minecraft, rely on these microtransactions to turn a profit. Indeed, the design and marketing strategy associated with such games is rooted, in part, in the theory that the revenue from the on-going microtransaction system will outweigh the revenue from a one-time-purchase game. That is because microtransaction spending can easily add up to hundreds, or even thousands, of dollars from an individual user.

79.  Accordingly, modern gaming companies are enlisting PhD behavioral psychologists and using research to implement programming into their games that will addict players with a goal of increasing the amount of playtime, thereby prolonging their exposure to in-game marketing for in-game purchases in order to improve the odds players will engage with microtransactions that generate profits for the game developer.

## C. OPERANT CONDITIONING SYSTEMS AVAILABLE IN MINECRAFT AND ROBLOX

80.  Minecraft uses a core gameplay loop to encourage continuous play. This involves repeatable, moment-to-moment actions like mining resources, crafting tools, and building structures. The player's decisions and accomplishments in each cycle provide a satisfying, immediate reward.

81.  Minecraft uses a secondary loop that includes long-term projects and goals built from the core gameplay loop to gather all game resources the play needs to create a false sense of a significant long-term achievement.

///

82. Minecraft rounds out the operant conditioning with a meta loop which creates the ambitious target of a player mastering the game or building a functional world. These ambitious targets ensure the players have a reason "why" they need to return to the game.

83. Roblox also uses a compelling core loop, a robust game progression system and a gaming community to reinforce coming back to the game.

84. The Roblox core loop uses behavior techniques of immediate fun engaging players within the first five minutes of gameplay. Then Optimal Pacing is used to ensure the game is balanced in difficulty to the skill of the player to avoid feelings of inadequacy or difficulty creating a desire to continue playing and a false sense of achievement. Immediate feedback is provided to trigger positive reinforcement of the desired behavior of increased gameplay. To keep the continued play going an element of randomness which includes random events, new challenges or loot-drop system is deployed to lure in gamers.

### 1. Rewards Reinforce Negative Behavior -Continuous Video Game Play

85. In the context of gaming Products, rewards act as positive reinforcement, encouraging gamers to keep playing. Consider the satisfaction of leveling up, finding a rare item, or achieving a high score. Each of these milestones provides a reward, which triggers a dopamine release in the brain—the internal "feel-good" chemical. This surge of dopamine reinforces the behavior, making it more likely that a gamer will come back to the game in search of that same pleasure.[14]

86. Skinner's research on reinforcement also emphasized the power of variable rewards—rewards that come at unpredictable times or intervals. In his famous experiments with pigeons, Skinner found that animals were more motivated to perform a task when they were rewarded on a variable schedule rather than at regular intervals. This concept translates well to games, where rewards are often distributed unpredictably. Think of loot drops in adventure games or rare cards in a deck-building game. The uncertainty of when and what reward will be given keeps players engaged, eager to discover what's next.

///

---

[14] Skinner, B. F. (1938). *The behavior of organisms: an experimental analysis.* Appleton-Century.

87. All Defendants built operant conditioning into their respective games by positively reinforcing and rewarding continued video gameplay time and punishing users when they do not play or otherwise fail to conform to the desired behavior of increased play time and increased purchasing of microtransactions.

### 2. Game Flow-Keeps Player connected to the Operant Conditioning

88. When a game's difficulty level is balanced just right—not too easy, but not too hard—it can lead to what psychologist Mihaly Csikszentmihalyi calls the Flow State. This is a state of deep focus where the player is completely absorbed in the activity, often losing track of time.[15] Games use incremental challenges to create flow, gradually increasing difficulty to keep players in the zone, fully engaged but not overwhelmed. Achieving flow is inherently rewarding, encouraging repeat play as players seek to experience it again.

### 3. Social Identity in Gaming-Operant Conditioning

89. Games don't just offer individual rewards; they often fulfill social needs as well. Research has shown that social interactions in games, such as cooperation, competition, and team-based activities, are strong motivators for repeat play. According to Social Identity Theory, people derive a sense of self and belonging from their group affiliations.[16] When players form teams, clans, or guilds, they start to see themselves as part of a community, which encourages loyalty and continued participation.

90. In a survey conducted by the Entertainment Software Association (ESA) in 2024, 72% of U.S. gamers said they believe video games can introduce people to new friends and relationships. Social games that involve interaction with friends or online communities make the experience richer and more satisfying, which reinforces the desire to keep playing.[17]

///

---

[15] Csikszentmihalyi, Mihaly. (1990). Flow: The Psychology of Optimal Experience.
[16] Tajfel, H., & Turner, J. C. (1979). An integrative theory of intergroup conflict. In W. G. Austin, & S. Worchel (Eds.), The social psychology of intergroup relations (pp. 33-37). Monterey, CA: Brooks/Cole.
[17] https://www.theesa.com/video-games-remain-lifelong-source-of-entertainment-for-190-6-million-americans/

### 4.  Psychology of Progress - Operant Conditioning Tool

91.  Games are known for their use of achievements, badges, and progress indicators—elements that symbolize advancement and status. These features draw on the Goal-Setting Theory, which posits that specific, challenging goals lead to higher performance and greater motivation (Locke & Latham, 1990).[18] When players see a clear path to progression, such as leveling up or earning achievements, they are motivated to reach those milestones, which enhances engagement and repeat play.[19]

### 5.  Badge Effect and Status

92.  Badges, trophies, and leaderboards add an additional layer of motivation by appealing to players' desire for recognition and status. Psychologists refer to this as extrinsic motivation—the drive to earn rewards or recognition from external sources (Deci & Ryan, 1985).[20] This is particularly powerful in social games, where players can see each other's achievements, creating a sense of friendly competition. The desire to achieve status among peers often keeps players coming back, striving for new achievements and recognition.

### D.  CONTINUOUS VIDEO GAME PLAY ORIGINATING FROM OPERANT CONDITIONING RESULTS IN VIDEO GAME ADDICTION

93.  Operant conditioning is a behavior modification system serving as the architecture of video game design that many of today's video games utilize. The use of operant conditioning towards a gamer can be one of the factors contributing towards video game addiction; operant conditioning is the strategy while video game addiction can be the by product or operant conditioning.[21]

94.  Once engaged in the game, the player sets asides their rules for their daily life and accepts the rules of the game as the new way to live life.[22]

///

///

---

[18] Locke, Edwin & Latham, Gary. (1991). A Theory of Goal Setting & Task Performance. The Academy of Management Review. 16. 10.2307/258875.
[19] Id.
[20] Deci, E. L., & Ryan, R. M. (1985). Intrinsic Motivation and Self-Determination in Human Behavior. New York, NY: Plenum.https://doi.org/10.1007/978-1-4899-2271-7
[21] Daniel Vu. "An Analysis of Operant Conditioning and its Relationship with Video Game Addiction" ART 108: Introduction to Games Studies (2017).
[22] Id.

1.  **Amount of Time Played Correlated to Sequalae of Video Game Addiction**

95. One study showed positive bioelectrical prefrontal activity during gaming tasks of healthy gamers between the ages of 8 and 12 who limited game play to 20 minutes.[23]

96. In contrast, a similar study of unhealthy gamers with an IGD diagnosis showed a thinner cortex in the brain with a smaller volume of gray matter.[24] The reward-related network and the gamers inhibition system was altered, the orbitofrontal cortex and anterior cingulate cerebral area were overstimulated, similar to a drug addiction.[25]

97. Recently, Kwak et al. longitudinally compared 14 adolescents with IGD to 12 professional internet gaming students who practiced for about ten hours a day, within a defined support system that included practice, physical exercise, lectures on team strategy, rest and mealtimes. After one year, both groups showed increased brain activity within the attention system of the parietal lobe. However, professional gamers improved problematic behaviors, impulsivity, aggression, depression and anxiety, while adolescents with internet gaming disorder showed no behavioral improvement and dysfunctional brain activity within the impulse control network in the left orbitofrontal cortex.[26]

2.  **Attention Deficit Disorders Exacerbated with Video Game Addiction**

98. A three-year longitudinal study by Gentile demonstrated that the more time a child spends playing video games the more problems they have with attention span.[27] In fact, children with

[23] Mondéjar T., Hervás R., Johnson E., Gutiérrez-López-Franca C., Latorre J.M. Analyzing EEG waves to support the design of serious games for cognitive training. J. Ambient Intell. Humaniz. Comput. 2019;10:2161–2174. doi: 10.1007/s12652-018-0841-0.

[24] Lee D., Park J., Namkoong K., Kim I.Y., Jung Y.-C. Gray matter differences in the anterior cingulate and orbitofrontal cortex of young adults with Internet gaming disorder: Surface-based morphometry. J. Behav. Addict. 2018 doi: 10.1556/2006.7.2018.20

[25] Smirni D, Garufo E, Di Falco L, Lavanco G. The Playing Brain. The Impact of Video Games on Cognition and Behavior in Pediatric Age at the Time of Lockdown: A Systematic Review. Pediatr Rep. 2021 Jul 14;13(3):401-415. doi: 10.3390/pediatric13030047. PMID: 34287345; PMCID: PMC8293336.

[26] Smirni D, Garufo E, Di Falco L, Lavanco G. The Playing Brain. The Impact of Video Games on Cognition and Behavior in Pediatric Age at the Time of Lockdown: A Systematic Review. Pediatr Rep. 2021 Jul 14;13(3):401-415. doi: 10.3390/pediatric13030047. PMID: 34287345; PMCID: PMC8293336.

[27] Gentile D.A., Swing E.L., Lim C.G., Khoo A. Video game playing, attention problems, and impulsiveness: Evidence of bidirectional causality. Psychol. Pop. Media Cult. 2012;1:62–70. doi: 10.1037/a0026969.

attention span problems such as ADHD, are more attracted to video games and find those kids neglect activities that would have otherwise demanded their control and attention such as homework, sports and household chores.[28]

99.  The sequalae of video game addiction causes anxiety, impulsivity, low self-esteem, poor school performance, emotional and social intelligence deterioration, social isolation, cognitive decline, exacerbation of ADHD, visual problems, seizures, orthopedic injuries, depression, addiction, orthopedic injuries from overuse injuries of controllers, suicide attempts and suicide.[29]

100.     The increase in the rate of suicide, of youth in particular, is occurring amid an increase in the percentage of youth playing video games. In 2017, 43% of U.S. students played video or computer games for 3 hours or more daily, an increase of 22% to 43% from 2003 to 2017 (CDC, 2018a). In addition, 15% of U.S. high school students were obese and 16% were overweight in 2017, an increase from 1999-2017 of 11% to 15% for obesity and 14% to 16% for overweight youth (CDC, 2019b).[30]

**E.  OPERANT CONDITIONING**

101.     The goal of video game addiction by Defendants is not healthy gaming, it has always been continuous video game play for profit.

102.     Defendants did not implement measures to allow parents and teachers to monitor and control video game play time. Parental controls are defective in most games and non-existent in the most frequently played Minecraft platforms. Implementing appropriate parental controls and safety systems would be sufficiently narrowly tailored to protect minors from the harmful effects of unauthorized behavior modification through operant conditioning, continuous play, the establishment of disordered behavior while still a minor, and other harms associated with Defendants' Products without restricting adults from accessing Defendants' Products.

---

[28] Gentile D.A., Swing E.L., Lim C.G., Khoo A. Video game playing, attention problems, and impulsiveness: Evidence of bidirectional causality. Psychol. Pop. Media Cult. 2012;1:62–70. doi: 10.1037/a0026969.

[29] Lérida-Ayala V, Aguilar-Parra JM, Collado-Soler R, Alférez-Pastor M, Fernández-Campoy JM, Luque-de la Rosa A. Internet and Video Games: Causes of Behavioral Disorders in Children and Teenagers. Children (Basel). 2022 Dec 31;10(1):86. doi: 10.3390/children10010086. PMID: 36670637; PMCID: PMC9856521.

[30] Mary Cyrus (2022). The Association of Suicidality with Video Gaming and Physical Inactivity Among US Adolescents. Walden University

103.     Instead, each Defendant is accountable for failing to warn that operant conditioning is being used in Roblox and Minecraft for the goal of continuous video game play. Additionally, defendants failed to include available safeguards, such as accurate time tracking in cross platform, game sharing and educational versions of Minecraft, as well as defective and/or non-existent parental controls.

104.     Defendants' suppression of the diagnosis and treatment of video game addiction coupled with the failure to warn of continued video game play carried a risk of video game addiction and the sequalae flowing from the addiction demonstrates a reckless disregard for the safety and well-being of individuals such as Plaintiff.

105.     Furthermore, Defendants are aware that science has shown that prolonged use of video games by minors can result in lack of full development of the prefrontal cortex, cognitive decline, and inability to reach full educational potential.[31]

106.     IGD comes with a myriad of symptoms that include addiction, social isolation, depression, withdrawal symptoms that are often misdiagnosed with ADHD, exacerbation of ADHD and anxiety, all of which contribute to increased risk of suicide.

107.     Defendants knew of the risks of IGD and the other accompanying medical conditions yet continued to market Roblox as "educational" despite being fully aware of these risks, Defendants marketed their respective games and products to minors, even at most times without parental knowledge or consent in a school setting.

**F.  EXCESSIVE VIDEO GAME PLAY AND EFFECTS ON ADOLESCENT BRAINS**

108.     For almost two decades, research on the interaction between video game usage and the adolescent brain has shown that extensive usage has a severe impact on the adolescent brain, including loss of grey matter, which leads to severe physical and mental effects on the child. Many of these effects are indicators or consequences of IGD.

109.     One of the ways that the impact of video game usage is studied is research about the role dopamine plays in the brain during gameplay.

---

[31] Livny, Weinstein, and Weizman, *New Developments in Brain Research of Internet and Gaming Disorder,* 75 Neurosci.Biobehav. Rev. 314 (Apr. 2017)

110.    Video games can and do cause an intense dopamine release in the user that is similar in magnitude to that experienced by substance abuse or gambling. Dopamine is a neurotransmitter made in the brain that acts as a chemical messenger that communicates messages between nerve cells in the brain, as well as between the brain and the body. Dopamine serves as the brain's all-important "reward center" and, in addition, plays a critical role in several body functions including attention, mood, pleasurable reward and motivation, sleep, learning, and movement. The release of dopamine causes demonstrable physical, mental, and emotional responses in the human brain and body. This is especially true in minors, and particularly neurodivergent minors, whose brains are still developing. Increased frequency of dopamine releases can lead to withdrawal symptoms, including anger, irritability, or physical outbursts when the game is made unavailable.

111.    Video game addiction has been suggested to be as addictive as heroin.[32] In minors, the creation of this level of dopamine high at such a young age is difficult to overcome.

112.    The repetitive release of dopamine creates, reinforces, and strengthens a dysregulated or dopaminergic neural pathway that propels the user to hyperfocus on using the video games more and more, first at an increasing rate and then with compulsive desire until the impulse to use the video games develops into a disordered use or addiction.

113.    This dopaminergic response triggers impulsive behaviors outside of the gaming world consisting of life-altering impulsivity and inability to control behaviors that can and do cause a myriad of catastrophic physical, mental, and emotional disorders, symptoms, and injuries, including other addictions, significant withdrawal symptoms, maldevelopment of the brain's frontal lobe, dissociative behaviors, social isolation, damage and/or negative consequences to cognitive processes, attention disorders, severe depression, morbid obesity, mal and/or undernutrition, risk of suicide, risk of harming others and other harmful effects, all to the severe detriment and damage to the minor, and to the severe emotional detriment and pecuniary or economic damage to their families and caretakers.[33]

///

---

[32] https://abc13.com/post/fortnite-can-be-as-addictive-as-heroin-health-experts-say-/4410795/
[33] E. Suárez-Soto, A. Peris-de la Hoz, A. Sanchez-Fernandez-Quejo, E. Rodriguez-Toscano, N. Lagunas, B. Reneses, A. De la Torre-Luque, Problematic gaming use and psychological distress among Spanish young adults: A comprehensive study, The European Journal of Psychiatry, Volume 39, Issue 1,2025,100279, ISSN 0213-6163,https://doi.org/10.1016/j.ejpsy.2024.100279.

114.     Additional research on the impact of video games reports physical changes to the brain and brain matter as a result of gameplay.

115.     Research has shown that prolonged use of video games affects the prefrontal cortex of the user, causing a loss of grey matter, lower cognitive function, and an inability to regulate impulse control.  The "Operant Conditioning" utilized in video games reward impulsivity, which causes a lack of development in the prefrontal cortex. Instead, the regions of the brain that create impulsivity are overutilized and fed while executive function is starved leading to a lack of brain development in the prefrontal cortex. Research has also concluded that such use of video games may lead to negative effects like stress, aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, and behavioral addiction disorders.

116.     Clinical evidence has shown that users addicted to online games experience biopsychological symptoms and complications, including symptoms traditionally associated with substance abuse and addiction, such as hangovers, changes in mood, ability to adapt, withdrawal, conflict, and recurrence symptoms.

117.     Empirical studies indicate that gaming disorders are associated with detrimental health-related outcomes.[34]

118.     Brain imaging studies have shown that excessive use of video games negatively affects the brain regions responsible for reward, impulse control, and sensory-motor coordination.

119.     Other studies have shown that disordered and/or excessive use of video games leads to negative consequences on cognitive processes, including multi-second time perception, inhibition, and decision-making. Gamers lack time awareness of how long they have played a game.[35]

120.     During adolescence, the prefrontal cortex—the locus of judgment, decision-making, and impulse control—is still developing and undergoing major reorganization. This region of the brain does not reach maximum capacity until the age of 25 to 30. The executive control center of the

---

[34] Pierpaolo Limone, Benedetta Ragni, Giusi Antonia Toto, The epidemiology and effects of video game addiction: A systematic review and meta-analysis, Acta Psychologica, Volume 241,2023,104047, ISSN 0001-6918, https://doi.org/10.1016/j.actpsy.2023.104047.

[35] Wood RT, Griffiths MD, Parke A. Experiences of time loss among videogame players: an empirical study. Cyberpsychol Behav. 2007 Feb;10(1):38-44. doi: 10.1089/cpb.2006.9994. PMID: 17305447.

1    prefrontal cortex is essential to one's ability to healthfully weigh risks and rewards and for pausing

2    the pursuit of immediate rewards in favor of more adaptive longer-term goals. The lack of full

3    development of the prefrontal cortex is arguably why young people are more likely to engage in hours

4    of use while ignoring basic needs like food, sleep, and hygiene. Without mature frontal lobes, minors

5    are less able to weigh potential negative consequences and curb potentially harmful behavior like

6    excessive use of video games, which further impacts frontal lobe development.

7        121.    Brain imaging studies related to IGD have shown structural changes in the brain,

8    particularly a reduction in white-matter density (consisting mostly of cells and axons that transmit

9    signals from the cerebellum to other brain regions) and grey-matter volume (associated with

10   emotions, perception, memory, and motor control). Specifically, studies showed several regions of

11   the brain demonstrated reduction in grey-matter volume in gaming disorder participants, as depicted

12   here:



36

19       122.    Brain activation studies have shown that the use of video games causes changes in the

20   reward and impulse control regions of the brain, and that engaging with video games activates regions

21   of the brain in a manner similar to the way the brain is activated in response to cue-exposure to drugs

22   (whereby addicts are exposed to relevant drug cues to extinguish conditioned responses).

23       123.    Additional brain activation studies have shown that individuals with gaming disorders

24   have impaired inhibitions, and that video game cues activate craving, attention, and executive

25   function areas of the brain. Those cognitive, sensory-motor, and emotional processes may be

26   associated with long-term changes to the brain because of prolonged use of video games. Regions

27

28   _____
     [36] Livny, Weinstein, and Weizman, *New Developments in Brain Research of Internet and Gaming Disorder*, 75 Neurosci. Biobehav. Rev. 314 (Apr. 2017).

that showed activation in response to video game cues in gaming disorder participants in more than two studies are depicted in the following image:



37

124.    Structural studies of the brain have shown alterations in the volume of the ventral striatum (a critical component of motor and reward systems in the brain) are possible because of changes in reward regions of the brain. One comparison study of young adults with a mean age of 24 revealed that individuals who engage in excessive use of video games tend to have lower cognitive function, particularly in areas of verbal ability and working memory.

125.    Research has shown that a neurodivergent minor with a diagnosis of Attention-Deficit Hyperactivity Disorder ("ADHD") or Autism Spectrum Disorder is at a higher risk of developing video game disorder or addiction, which can worsen one's ability to control impulsivity and result in brain damage.[38] Research has shown that while use of video games may foster creativity in some minors, such potential benefits are outweighed by the risk of developing addiction or disordered use of video gaming products, which typically develops swiftly in minors and neurodivergent individuals. This is particularly true when video games incorporate addictive and manipulative tactics, as well as other problematic psychological programing.

126.    Defendants' operant conditioning behavior modification systems materially contribute to these harmful effects experienced by users, especially minor users, of each Defendants' Products.

///

///

---

[37] Aviv Weinstein et al., *Neurobiological Mechanisms Underlying Internet Gaming Disorder*, 22(2) DIALOGUES CLIN. NEUROSCI. (2020).

[38] Micah O. Mazurek & Christopher R. Engelhardt, *Video Game Use in Boys with Autism Spectrum Disorder, ADHD, or Typical Development*, 132 Am. Acad. of Ped. J.L. 2 (2013).

### G.  GAMING ADDICTION IS A RECOGNIZED AND DIAGNOSABLE CONDITION

127.    Addiction to and disordered use of video games and internet gaming is a recognized, diagnosable mental disorder and form of behavioral addiction codified by the American Psychiatric Association's 2013 Diagnostic and Statistical Manual of Mental Disorders (DSM-5).[39] The diagnostic symptoms of IGD currently set forth in DSM-5 include: (1) Preoccupation with playing and/or using video games; (2) Withdrawal symptoms (sadness, anxiety, irritability, and/or other unpleasant symptoms) when access to play and/or use is removed, precluded, or reduced; (3) Tolerance - the need to spend more time playing and/or using video games to satisfy the urge and desire to do so; (4) Loss of Control or the inability to reduce video game playing and usage time and/or unsuccessful attempts to quit gaming; (5) Giving up other activities or loss of interest in previously enjoyed activities due to compulsion to play video games; (6) Continuing to play and use video games despite negative or problematic consequences; (7) Deceiving family members or others about the amount of time spent playing and/or using video games; (8) Using video games to "escape" or relieve negative moods, such as guilt or hopelessness; and (9) Jeopardized school or work performance or relationships due to playing and/or using video games.

128.    Nationally recognized institutions such as the Cleveland Clinic and the National Center for Biotechnology Information (NCBI) also recognize video game addiction and categorize the addiction as falling under the general category of IGDs.[40]

129.    As of 2022, "Gaming disorder"—disordered use of and/or play with video games—is a recognized mental health disorder by the World Health Organization and International Statistical Classification of Diseases and Related Health Problems. "Gaming disorder" is included within the subcategory "ICD-11" entitled "Disorders due to substance use or addictive behaviors."[41] "Gaming disorder" is defined in the 11th revision of the International Classification of Diseases as a pattern of persistent or recurrent gaming behavior, specifically "digital gaming" or "video-gaming," which may be online or offline, manifested by: impaired control over gaming (e.g., onset, frequency, intensity,

---

[39] It is also recognized in the recently released Diagnostic and Statistical Manual of Mental Disorders, Text Revision (DSM-5-TR).
[40] Shabina Mohammad, Raghad A Jan, & Saba L Alsaedi, *Symptoms, Mechanisms, and Treatments of Video Game Addiction*, Cureus (Mar. 31, 2023).
[41] Other disorders found in that subcategory include alcoholism and gambling addiction.

1    duration, termination, context); increasing priority given to gaming to the extent that gaming takes

2    precedence over other life interests and daily activities; and continuation or escalation of gaming

3    despite the occurrence of negative consequences.

4    **H.  ADDICTIVE GAME DESIGN FEATURES CAUSE SIGNIFICANT HARM TO**

5    **MINORS**

6    130.    Due to the design and effects of Defendants' operant conditioning, these behavior

7    modification systems and Products are not content-neutral and the human population most vulnerable

8    to the combination of game developers' microtransaction methodology and addictive operant

9    conditioning design features are minors; minors who are neurodivergent are even more susceptible to

10   becoming addicted. Video game developers, including Defendants, knew this, but nonetheless

11   purposefully designed their games and platforms to exploit that vulnerable population, causing injury

12   and detriment, including to Plaintiff. Doing so has yielded the intended results: video game

13   developers, including Defendants, have earned extraordinary financial revenue from this group of

14   users as a result of placing their addictive Products that are targeted to minors into the stream of

15   commerce.

16   131.    Each Defendant knew or was aware, or should have known and should have been

17   aware, that their respective Products were dangerous and harmful to users, particularly minors, when

18   used as intended and in a reasonably foreseeable manner. In fact, each Defendant intentionally caused

19   and designed their respective Products to most effectively cause users with developing brains to

20   become addicted or disordered in their desire to use the Products. To that end, upon information and

21   belief, each Defendant employed behavioral psychologists and/or neuroscientists to develop Products

22   that incorporated design features premised upon psychological tactics engineered to keep users

23   engaged in using the Products for longer periods of time.

24   132.    The microtransactions and other technologies, designs, features, mechanisms,

25   algorithms, artificial systems, programs, and other processes each Defendant incorporated into their

26   Products were implemented in a manner such that users (and, when users are minors, their caretakers)

27   do not understand and have no way of understanding (or uncovering through reasonable diligence)

28

that their use of the Products involves engagement with intentionally addictive design features that are physically damaging to their brains and bodies, and financially rewarding to the Defendants.

133.    There is no meaningful disclosure of the addictive mechanisms and microtransactions in each Defendant's Products at the time they are purchased and/or downloaded to allow prospective users to make informed decisions as to whether using the Products are desirable, appropriate, safe, or worth the potential risk.

134.    At all times material hereto, each Defendant targeted consumers/purchasers, including minors, and specifically including Plaintiff herein, to use their respective Products and engage in microtransactions whereby in-game perks are exchanged for real money through in-game targeted solicitations.

135.    Each Defendant, with knowledge of Plaintiff's age and without regard to other neurodivergent traits or social factors, targeted Plaintiff with manipulative programming to prolong use of their Products in hopes of inducing Plaintiff to engage in microtransactions during their use of the Products. As a result of Plaintiff's use of each Defendant's Products, and because of the addictive design features incorporated into the Products, Plaintiff suffered video game addiction, compulsiveness, and resulting physical, psychological, emotional and economic harm, and was damaged as herein alleged.

## I.    SPECIFIC OPERANT CONDITIONING METHODS USED BY DEFENDANTS

### 1.    Minecraft

#### a.    Mojang and Microsoft Design, Develop, and Market Minecraft

136.    Minecraft was first developed and released by Mojang in November 2011.

137.    In September 2014, Microsoft acquired Mojang and its intellectual property (including Minecraft).

138.    After its acquisition of Mojang, Microsoft has been directly and actively involved with Mojang in the design, development, testing, production, manufacture, labeling, marketing, advertising, promotion, supply, sale, and distribution of Minecraft. Indeed, since acquiring Mojang, Microsoft has overseen over 125 updates to Minecraft.

///

1    139.     To date, over 300 million copies of Minecraft have been sold,[42] and the game averages

2    around 200 million players per month.[43]

3        b.  **Minecraft Targets Young Children to Increase Profits and Addict Younger**

4            **Children**

5    140.     Minecraft is rated as safe for children 10 and older by the Entertainment Software

6    Rating Board ("ESRB"), which is the leading game-rating system for games in the United States.

7    141.     Nonetheless, Microsoft and Mojang know that much of Minecraft's player base is

8    younger than 10.

9    142.     Studies have shown that approximately 53% of children aged 6 to 8 and 68% of

10   children aged 9 to 12 play Minecraft.[44]

11   143.     Despite Minecraft's age rating, Minecraft has engaged in numerous in-game virtual

12   and physical product collaborations with child-friendly entities such as LEGO, Avengers, Mothers of

13   the Galaxy, Spiderman, Moana, Star Wars, Sonic the Hedgehog, Super Smash Bros., The Incredibles,

14   Angry Birds, Frozen, Ice Age, Sponge Bob Square Pants, Toy Story, Minions, Power Rangers, and

15   more.[45]

16   144.     Most, if not all, of these collaborations are geared towards a wide audience that

17   unmistakably includes minors under the age of 10. Many young children watch Disney movies or

18   play with LEGOs or Hot Wheels. Microsoft and Mojang explicitly and intentionally market Minecraft

19   to young children by collaborating with the above entities.

20   145.     In addition to virtual collaborations, Microsoft and Mojang also have physical

21   Minecraft merchandise they produce or sponsor, most of which are toys or children's items. For

---

22   [42] Britney Nguyen, Minecraft Just Surpassed 300 Million Sales–Here's The Only Video Game Still
23   Beating It, Forbes (Oct. 16, 2023),
     https://www.forbes.com/sites/britneynguyen/2023/10/16/minecraft-just-surpassed-300-million-
24   sales-heres-the-only-video-game-still-beating
     it/#:~:text=Minecraft%20has%20reached%20over%20300,Minecraft%20Live%202023%20this%2
25   0weekend.
     [43] Spencer Whitworth, Minecraft Live Player Count (September 2024), Sportskeeda (Apr. 1, 2025),
26   https://www.sportskeeda.com/minecraft/minecraft-live-player-count.
     [44] Jane Mavoa & Marcus Carter, Minecraft Teaches Kids About Tech, But There's A Gender
27   Imbalance At Play, The Conversation (Jan. 16, 2018), https://theconversation.com/minecraft-
     teaches-kids-about-tech-but-theres-a-gender-imbalance-at-play-89496.
28   [45] Category: Collaborations, Minecraft Wiki, https://minecraft.wiki/w/Category:Collaborations (last
     visited July 24, 2025).

example, Microsoft and Mojang have created a kids educational touchscreen smart watch; an LED lamp that looks like a Minecraft torch; a glitter motion light; plush toys based on Minecraft characters; Minecraft themed LEGO sets, action figures, board games, and Hot Wheels; foam weapons; clothing; pajamas; and Halloween costumes. Minecraft also has a line of books for children as young as five that are intended to teach children how to read.

146.     Microsoft and Mojang organize their advertisement and collaboration strategies around the interests of young children and make a significant portion of their revenue from young children and their families.

         **c.  Minecraft School Edition**

147.     Children are introduced to Minecraft School Edition at a young age which creates an "Operant Conditioning" lab[46] to assure school age children are taught to respond to game stimuli that create the desired response, such as continued play or purchasing more microtransactions.

148.     Defendants have had knowledge that IGD has been a consequence of continued video game play well over a decade.

149.     On information and belief, Defendants have spent considerable time and money to suppress and fight the medical community, parents and school awareness of the video game addiction epidemic.

150.     Upon information and belief, Minecraft Education was introduced into the school system with a fully drafted implementation program to assure schools would assist in unknowingly assuring children would become addicted to video games. The Trojan Horse of video game addiction began in schools—not in parent's homes—and was touted as "educational".

151.     There is no parental consent or ability to track the amount of video game play for time spent on Minecraft Education. Instead, children were first introduced to Minecraft from their school issued laptop without parental consent to use operant conditioning in an educational or video game setting.

///

---

[46] Irwin Helvey, Casey & Gates, Lucille & Rountree, Paige & Cariveau, Tom. (2023). Gamified human operant research: A brief introduction to Minecraft Education. 10.17605/OSF.IO/VT58F.

152.    Video game sharing and cross platform play assured the real amount of video game play would always be elusive for a parent since both allow children such as to play games that are not trackable for parents.

153.    IGD comes with a myriad of symptoms that include addiction, social isolation, depression, withdrawal symptoms that are often misdiagnosed as ADHD, exacerbation of ADHD and anxiety, all of which contribute to increased risk of suicide.

154.    Defendants knew of the risks of IGD and the other accompanying medical conditions yet continued to market Minecraft as "educational" despite being fully aware of these risks, Defendants marketed their respective games and products to minors, even at most times without parental knowledge or consent in a school setting.

      **d.  Microsoft and Mojang Deceptively Promise Safety and Educational Value in Minecraft**

155.    Microsoft and Mojang do not adequately inform users of the inherent risks involved with using and playing Minecraft or that the Product was designed to make users play more to their potential harm.

156.    Instead, Minecraft's website provides users, potential users, and mothers with false assurances of safety. For example, Microsoft and Mojang state that:

    a.    they "hold [them]selves accountable for making Minecraft as safe as possible for everyone."[47]

    b.    it is "so important that [their] games are a safe and welcoming place for all players."[48]

    c.    "player safety is a priority for Mojang to ensure everyone feels safe."[49]

    d.    their "community standards help [them] build a community that is open and safe for everyone."[50]

*///*

---

[47] Minecraft Help Center – General Safety, Minecraft, https://help.minecraft.net/hc/en-us/articles/8047895358605 (last visited July 24, 2025).
[48] *Id.*
[49] Community Standards for Minecraft, Minecraft, https://www.minecraft.net/en-us/community-standards (last visited July 24, 2025).
[50] Minecraft End(er)-User License Agreement ("EULA"), Minecraft, https://www.minecraft.net/en-us/eula (last visited Apr. 8, 2025).

157.    Minecraft does not offer any parental controls for Minecraft Education or offline play of Minecraft.

158.    Minecraft does feature some parental controls for certain Xbox play, but they are grossly deficient. While minor accounts for children younger than 16 are automatically created with some restrictions on in-game communications and other features, there is no age verification process. If a minor who is under 16 wants to create a Minecraft account with a fictitious birth date, they can, and can then create an account and play Minecraft without the restrictions of an account where a user represents they are under 16.

159.    Microsoft and Mojang could, but choose not to, require express parental consent for minors under 16 to create an account. If a minor under 16 creates an account, they can still access almost all game content and purchase items. There is no daily spending limit automatically imposed on any minor accounts.

160.    Parents can access parental controls to change the automatic restrictions set by Microsoft and Mojang if their minor is under 16, however, such features are only available if a parent creates their own account and links it to the minor's account. To engage with/change any parental control settings, the parent must first know the account exists, and subsequently know the gamertag information to link their account to their minor's account.

161.    Microsoft and Mojang do not provide parental controls within Minecraft regarding screen time, gameplay, and/or usage. Microsoft and Mojang could, but choose not to, allow parents to set time limits on their Minecraft account. Microsoft and Mojang also could, but do not, allow any users to set self-imposed time limits on their Minecraft account.

162.    Lack of parental controls are by design to conceal the "operant conditioning" built into the video game as well as conceal the time spent playing Minecraft.

163.    At account setup, Minecraft's website contains no warnings labels, banners, or messaging informing minor, parents or schools that operant conditioning is being used to program the children to continuously play Minecraft. There is no warning of the sequalae of video game addiction and the attendant side effects of video game addiction stemming from excessive use of

1  Microsoft and Mojang's Product. Users do not know their behavior is being manipulated through a

2  system of rewards and punishments in the video game.

3    164.    Microsoft and Mojang do not disclose to the public or users of Minecraft any of the

4  psychological tactics or addictive features they purposefully incorporate into their Product. Instead,

5  Microsoft and Mojang tout their Minecraft game as educational and have developed Minecraft

6  Education Edition for use in the classroom.

7    165.    Minecraft: Education Edition ("Minecraft Education") is a game-based learning

8  platform. Minecraft Education uses the Minecraft graphics with "features built specifically for

9  learning environments." It includes over "600 standards-aligned lessons,"[51] and includes coursework

10  across various subjects.[52]



18    166.    Though Minecraft's age-rating is for children 10 and older, Minecraft Education has

19  lesson plans for children as young as 5.[53] and encourages school leaders, educators, and parents to

20  use Minecraft. Minecraft Education provides resources so educators can "learn to teach with

21  Minecraft."[54]

22    167.    Accordingly, the use of Minecraft Education introduces children to games that are

23  years younger than Minecraft's age rating.

---

[51] What is Minecraft Education?, Minecraft Education, https://education.minecraft.net/en-us/discover/what-is-minecraft (last visited July 24, 2025).
[52] Minecraft Education For Educators: Get Started, Minecraft Education, https://education.minecraft.net/en-us/get-started/educators (last visited July 24, 2025).
[53] Minecraft's own website states "[s]oon students from kindergarten to graduation can utilize Minecraft Education." Back to School Preview: Make it Minecraft!, Minecraft Education (Apr. 8, 2025), https://education.minecraft.net/en-us/blog/back-school-preview-make-it-minecraft
[54] Minecraft Education For Educators: Get Started, Minecraft Education, https://education.minecraft.net/en-us/get-started/educators (last visited Apr. 8, 2025).

- 32 -

e.   **Minecraft was Designed with Intentionally Addictive Features.**

168.     Upon information and belief, Microsoft and Mojang actively employ or have employed psychologists, behavioral experts and actual minor gamers to work on Minecraft development.

169.     One example of an intentionally addictive feature within Minecraft is a specific in-game reward system known as "advancements" or "achievements" created by Microsoft and Mojang in order to incentivize players to engage in repeated and prolonged sessions playing Minecraft.

170.     In Minecraft Java, when a user completes a specific action or "advancement," they receive a number of "Experience Orbs" or "EXP" or "XP", which are used like a currency to enhance user's in-game equipment and reach new levels of the game. XP is gained by performing specific tasks, like successfully defending a village from a raid or killing a hostile monster:[55]



171.     When a user obtains enough XP, they can "level up," meaning the user's character advances to a higher level, becomes more powerful, and gains access to new talents and equipment.[56]

172.     In Minecraft Bedrock, when a user completes a specific action or task, they receive an achievement or trophy. The achievement is then logged in the player's Minecraft account. Most achievements provide in-game rewards such as creator items or emotes when unlocked.

173.     Not all advancements and achievements are equally easy to obtain. Instead, Microsoft and Mojang have intentionally created advancements and achievements that incentivize many hours and/or days of gameplay. By way of example, Microsoft and Mojang chose to reward players for playing Minecraft for 100 days, playing underwater for 10 minutes, building maps from pieces hidden throughout the game, trading 1,000 emeralds, collecting a surplus of resources, and more. These

---

[55] Advancement, Minecraft Wiki, https://minecraft.fandom.com/wiki/Advancement (last visited July 24, 2025).
[56] How to Earn Experience Points & Level Up in Minecraft, (Jan. 24, 2022), https://www.dummies.com/article/home-auto-hobbies/games/online-games/minecraft/how-to-earn-experience-points-and-level-up-210066/.

achievements can take countless hours across many days to unlock due to the complexity and/or time-consuming nature of the steps needed to unlock the achievement.

174.     This reward system creates addictive engagement and encourages players to continue gameplay.

175.     Microsoft and Mojang knew that its Minecraft Product contained an inherent risk of abuse, addiction, and compulsive use by minors and the harms that arise therefrom, but instead of disclosing such harms Microsoft and Mojang marketed and misrepresented Minecraft as "educational" and safe for use by minors.

176.     The use of operant conditioning, a lack of warnings about the harms of use, no option for self-imposed limits on playtime, an achievement system that rewards prolonged and repeated gaming sessions, and other features described herein are all examples of Microsoft and Mojang designing Minecraft with harmful psychological tactics to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, despite Microsoft and Mojang's knowledge that abuse and compulsive use of its Product by foreseeable users, i.e., minors and neurodivergent individuals, can and did lead to users, including Plaintiff, suffering from addiction, withdrawal symptoms, negative consequences on cognitive processes.

177.     Microsoft and Mojang marketed and misrepresented Minecraft as safe for all ages without warning of said risk of injury and addictive design, ultimately helping create and foster an epidemic of video game addiction in minors.

178.     Minecraft's behavior modification systems include a core gameplay loop to encourage continuous play. This involves repeatable, moment-to-moment actions like mining resources, crafting tools, and building structures. The player's decisions and accomplishments in each cycle provide a satisfying, immediate reward.

179.     Minecraft 's behavior modification systems also use a secondary loop that includes long-term projects and goals built from the core gameplay loop to gather all game resources the play needs to create a false sense of a significant long-term achievement.

///

180.     Minecraft rounds out the operant conditioning with a meta loop which creates the ambitious target of a player mastering the game or building a functional world. These ambitious targets ensure the players have a reason "why" they need to return.

### 2.  Roblox Corp.

#### a.  Roblox Gameplay Basics

181.     Roblox is a video game and platform that was developed and published by Roblox Corp. The game was released in September 2006.

182.     At present, Roblox has approximately 111.8 million daily active users.[57]

183.     More than 45% of the consumers playing Roblox are under age 13.[58]

184.     Roblox is available to play on gaming consoles, computers, tablets, and cellular devices.

185.     Roblox is an online game that is free to download and play, making it easily accessible to all users, including minors.

186.     Individuals that wish to play Roblox must create a Roblox account.

187.     In order to create a Roblox account, individuals must include a birth date, username, and password.

188.     Users of any age can create a Roblox account, though users cannot enter a birth date for any year after 2020. Roblox Corp. does not require users to verify their age when creating a Roblox account. Accordingly, users can represent that they are younger or older than their actual age.

189.     Users are also not required to obtain parental consent to create a Roblox account nor to play Roblox.

190.     Robux can be obtained by (a) purchasing it with real currency; (b) receiving recurring stipend given to users with a Roblox Premium membership; and (c) earning it from selling "game passes" or "developer Products" to other Roblox platers.

191.     Robux sales, and the revenue generated therefrom, increase as the number of active daily and active monthly Roblox users increases.

---

[57] Roblox Corp. Homepage, https://corp.roblox.com/ (last visited Sept. 29, 2025).
[58] The Roblox Corp. Homepage, https://corp.roblox.com/ (last visited Sept. 29, 2025).

Complaint for Damages

192.     Roblox has hosted over 3.7 billion virtual transactions on its platform.

193.     Roblox Corp. admits in public filed documents that it has the ability to "dynamically apply relevant content filters, anti-addiction rules, payment limits, parental; consent requirements., and certain other regional requirements."[59]

194.     For example, the games available to any particular user will vary based upon the age they entered when generating their account and what games Roblox's algorithm recommends to the users, and games can be restricted using ID verification requirements.

195.     In November of 2024, Roblox Corp. announced, "major updates to [its] safety systems and parental controls." It claimed these updates were implemented because "safety is and always has been foundational to everything [it does] at Roblox.

196.     The changes Roblox Corp. made in 2024 included changes to viewable content for each age group, parental controls for minor's screen time usage, and a new minimum age at sign up.

197.     April of 2024, Roblox Corp. implemented further updates to parental controls, stating that "[s]afety underpins everything we do at Roblox, particularly the safety of our youngest users." These 2025 updates included the ability for guardians to view their minor's top Roblox games the minor has played and how long the minor spent in each game for the past week. Guardian can now also block specific games and experiences for their minors.

198.     Until 2024, Roblox Corp. did not provide parental controls for minor's screen time and usage in Roblox. Roblox Corp. could have allowed parent-imposed time limits, but instead chose not to allow parents to set time limits on their minor's Roblox account for over eighteen years of operation.

199.     Until approximately September 2024, Roblox Corp. allowed users to represent their age as young as one year old and have access to virtually all content on the platform. Even now, parents whose minors are over the age of 12 cannot set restrictions on spending limits, set time limits, change privacy settings, or manage friends and communication on their minor's account. Roblox

---

[59] *Earning on Roblox*, Roblox Creator Hub, https://brands.roblox.com/resources/activating-on-roblox-the-virtual-economy (last visited Sept. 29, 2025).

1  Corp.'s changes to parental controls in 2025 did not address these failures to protect and limit minor

2  users.

3      200.    Until 2025, Roblox Corp. did not provide guardians with the ability to block specific

4  games and experiences, nor for guardians to view how much time their minor spends in each

5  respective game.

6      201.    The implementation of these restrictions and changes by Roblox Corp. in 2024 and

7  again in 2025 demonstrates its understanding of its responsibility to implement such restrictions and

8  safety measures, and further, demonstrates how easily Roblox Corp. can implement restrictions and

9  safety measures in general. The changes that Roblox Corp. implemented in 2024 and 2025 did not

10  require game by game review by Roblox. Corp., but instead were implemented as system-wide

11  updates.

12      202.    Despite its ability to implement anti-addiction rules, specific parental controls,

13  payment limits, and restrictions, upon information and belief, Roblox Corp. instead chooses not to

14  implement those restrictions in order to increase its profit.[60]

15              **b.  Roblox is Marketed to Minors Yet Lacks Adequate Safety Features**

16      203.    Roblox Corp. does not inform users that operant conditioning was used to elicit the

17  targeted behavior or continued video game play which posed a risk IGD and the injuries that

18  correspond to IGD.

19      204.    Instead, Roblox Corp. provides users, potential users, and guardians false assurances

20  of safety.[61] For example, Roblox Corp. states that:

21      a.    it has "built a platform with safety at the foundation;[62]

22  ///

23  ///

24  _____

[60] See Roblox Corporation, Form 10-Q (May 1, 2025), p. 68

25  (https://www.sec.gov/ix?doc=/Archives/edgar/data/0001315098/000131509825000118/rblx-
20250331.htm ("...[R]equirements for verified parental consent before allowing children to create

26  an account may limit the use of our Platform or reduce our overall demand for our Platform, which
would harm our business, financial conditions, and results of operations").

27  [61] Matt Kaufman, CFO, Driving Civility and Safety for All Users,
https://corp.roblox.com/newsroom/2024/07/driving-civility-and-safety-for-all-users (last visited

28  Sept. 29, 2025).
[62] *Id.*

b.    it "spend[s] hundreds of millions of dollars each year to meet [its] safety mission;[63]

c.    users should "learn about how Roblox's commitment to safety and civility helps students grow;[64]

d.    it "strive[s] to make [its] systems as safe as possible by default, especially for [its] youngest users;[65]

e.    its age recommendations for its Product are "grounded in child development research and informed by industry standards, essentially confirming its reliance on scientific research about adolescent development and content consumption;[66]

f.    its recommendations are created by "examin[ing] global industry standards and consult[ing] child development experts;[67]; and

g.    its Product is part of the "[n]ew era of teaching and learning," and teaches educators how to "pilot Roblox in [their] class or school district," assuring parents, educators, and students that its Product is safe for use of all ages.[68]

205.    While Roblox does feature some parental controls in its Product, almost all of these parental controls can only be applied to minors' accounts if the minor is under 13, despite Roblox Corp.'s alleged desire to create one of the safest online environments.

206.    Roblox Corp. states on its website that[69]

▼ First, get the go-ahead

If you're under 13 years old, please get permission from your parent or guardian to use Roblox. You shouldn't use our Services without their go-ahead.

---

[63] *Id.*
[64] Education, Roblox, https://education.roblox.com/ (last visited Sept. 29, 2025).
[65] Naren Koneru, Eleonore Vonck, Open Sourcing Roblox Sentinel: Our Approach to Preemptive Risk Detection (Aug. 7, 2025), https://corp.roblox.com/newsroom/2025/08/open-sourcing-roblox-sentinel-preemptive-risk-detection.
[66] Allowed Experience Controls, Roblox, https://en.help.roblox.com/hc/en-us/articles/31247519953172-Experience-Controls (last visited Sept. 29, 2025).
[67] Content Maturity Labels, Roblox, https://en.help.roblox.com/hc/en-us/articles/8862768451604-Content-Maturity-Labels (last visited Sept. 29, 2025).
[68] Education, Roblox, https://education.roblox.com/ (last visited Sept. 29, 2025).
[69] Roblox Privacy and Cookie Policy, Roblox, https://en.help.roblox.com/hc/en-us/articles/115004630823-Roblox-Privacy-and-Cookie-Policy (last visited Sept. 29, 2025).

207.    Roblox Corp. could, but does not, allow any users to set self-imposed time limits on their Roblox account.

### c.    Roblox Corp.'s Monetization of Intentionally Addictive Game Design

208.    Roblox Corp. designed the game-creation aspect of its Product to allow users to create their own Roblox video games for play and purchase by other Roblox users, including minors. Though third parties create the games, Roblox Corp. profits from all monetary transactions that occur within these third-party created games.

209.    Roblox Corp. constructed a "Creator Hub" on its website. The Creator Hub provides users with instructions (including "how-to" videos) from Roblox Corp. on how users can create their own Roblox games and also provides users with tools that enable or facilitate creation of their own Roblox games.

210.    Users that create their own games are referred to as "Creators" or "Developers." Upon information and belief, some the creators or developers include child psychologist and/or were designed with the assistance of child psychologists.

211.    Roblox Corp.'s website boasts that its top ten Developers made, on average, $33.9 million in 2024.[70]

212.    Roblox Corp. reports its Developers have been collectively paid $3.3 billion since 2018.[71]

213.    Beyond working with Developer to create additive games, Roblox Corp. purposefully designed other features within its Product to intentionally addict users.

214.    Roblox Corp. designed an achievement system within Roblox that rewards users for completing various tasks or actions. These achievements are not based upon a user's time or actions within a third-party game "experience," but rather the user's time and actions on Roblox's platform itself. For example, a user playing Roblox can unlock an achievement for playing Roblox for three days in a row, ten days in a row, and twenty days in a row. Likewise, users can earn an achievement for playing Roblox for an hour. When the user unlocks an achievement, they can see what percentage

---

[70] https://corp.roblox.com/newsroom/2025/09/roblox-annual-economic-impact-report
[71] https://create.roblox.com/docs/production/earn-on-roblox

of other users have unlocked the achievement. This system is designed to keep users engaged with the game, incentivize long periods of gaming repeated across multiple days, and ultimately increase Roblox Corp.'s profits.

215.    Roblox Corp. knows its Product incorporates addictive designs that pose risks of causing users to develop dangerous and disordered use and overuse of the Product. In fact, Roblox Corp. developed addictive strategies, game designs, and monetization schemes, implemented them on the Roblox platform itself and then instructed those developing "experiences" for its platform to incorporate those addictive features into their games that would be offered to minors.

216.    Upon information and belief, Roblox Corp. designed Roblox and the addictive strategies, game designs, and monetization schemes offered in its game and game design studio in conjunction with psychologists, neuroscientists, and other behavioral experts to intentionally maximize the likelihood of addiction of minor and neurodivergent users.

217.    Roblox Corp. admits to consulting child development experts for aspects of game development:[72] Roblox Corp. actively employs or has employed psychologists and behavioral experts within its People Science and Analytics department and User Experiences department.[73]

218.    The use of operant conditioning, the use of microtransactions within an otherwise free Product, a lack of warnings about the harms of use, no self-imposed limits on playtime, an achievement system that rewards prolonged and repeated gaming sessions, and other features described herein are all examples of Roblox Corp. employing harmful psychological tactics to take advantage of the chemical reward system of a user's brain  (especially a minor or neurodivergent person) to create addictive engagement, despite Roblox Corp.'s knowledge that abuse and compulsive use of its Product by foreseeable users, i.e., minors and neurodivergent individuals, can and did lead to users, including Plaintiff, suffering impacts on brain function, addiction, withdrawal symptoms, negative consequences on cognitive processes, and other injuries. Roblox Corp. marketed and

---

[72] Allowed Experience Controls, Roblox, https://en.help.roblox.com/hc/en-us/articles/8863284850196-Allowed-Experiences-Controls (last visited Sept. 29, 2025).
[73] See, e.g., Erica Snow, LINKEDIN, https://www.linkedin.com/in/erica-snow-phd-75272b39 (last visited Sept. 29, 2025); Philip Simmons, LINKEDIN, https://www.linkedin.com/in/philippsimmons (last visited Sept. 29, 2025); Carissa Kang, LINKEDIN, https://www.linkedin.com/in/carissakang (last visited Sept. 29, 2025).

1  misrepresented Roblox as safe for all ages without warning of said risk of injury and addictive design,

2  ultimately helping create and foster an epidemic of video game addiction in minors.

3      219.    Roblox's behavior modification systems also use a compelling core loop, a robust

4  game progression system and a gaming community to reinforce coming back to the game.

5      220.    The Roblox core loop uses behavior techniques of "immediate fun," engaging players

6  within the first five minutes of gameplay. Then Optimal Pacing is used to ensure the game is balanced

7  in difficulty to the skill of the player to avoid feelings of inadequacy or difficulty creating a desire to

8  continue playing and a false sense of achievement. Immediate feedback is provided to trigger positive

9  reinforcement of the desired behavior of increased gameplay. To keep the continued play going an

10  element of randomness which includes random events, new challenges or loot-drop system is

11  deployed to lure in gamers.

12  **J.  PLAINTIFF-SPECIFIC ALLEGATIONS**

13      221.    Plaintiff D.P. was exposed to and began using Defendants' Products—primarily

14  Minecraft and Roblox—at a young age which quickly developed into continued compulsive use. The

15  behavior modification systems embedded in these games, including operant conditioning

16  mechanisms, were successful in reinforcing continuous play patterns and fostering a compulsive,

17  disordered relationship with gaming. As a result, Plaintiff developed a video game addiction that was

18  a substantial factor in, and did in fact cause, the onset and worsening of physical and psychological

19  injuries, including Attention-deficit/hyperactivity disorder (ADHD), anxiety, depression, and

20  gamer's rage.

21      222.    Plaintiff began playing Minecraft and Roblox approximately in 2022, when Plaintiff

22  was around the age of four (4) years old.

23      223.    Since D.P. began to use Roblox and Minecraft, D.P. has continued to use Defendants'

24  Products without break, uncontrollably and compulsively.

25      224.    Within a few months, D.P. quickly developed a disordered compulsion or addiction to

26  using Roblox and Minecraft, and began consistently playing for several hours a day.

27  ///

28  ///

225.     D.P.  currently uses Defendants' Products for approximately 5-12 hours a day. Using the Defendants' Products, to date, continues to be the only activity D.P. wants to do, and left to D.P.'s own caretaking, D.P. likely would not ever willingly stop using the Products.

226.     Plaintiff D.P. rapidly became addicted to using the Defendants' Products; D.P.'s use of the Products and in particular the operant conditioning incorporated into the Products was a substantial factor in causing D.P.'s video game addiction and the sequela of injuries that has stemmed and resulted therefrom: video game addiction, cognitive impairment, preoccupation or compulsion with using the Products, withdrawal symptoms when use of the Products is removed or limited that includes emotional and volatile tantrums and rage, lack of personal hygiene, prioritizing gaming over all other activities, suffering school performance, loss of educational opportunity, unsuccessful attempts to control participation in gaming, effects of social isolation due to excessive gaming, use of gaming to escape or relieve negative moods, anxiety, depression, and continued use of Products despite knowledge of psychosocial problems.

227.     Plaintiff D.P. first began outpatient counseling in approximately August 2024.

228.     D.P.'s habit of often staying up late at night in order to use the Products caused D.P to be deeply fatigued and unalert during academic learning.

229.     Previously, Plaintiff D.P. spent roughly $10-$20 or more of their guardian's money on the Products monthly while engaged in excessive gaming

230.     Principle among the reasons and factors why Plaintiff D.P.'s ability to stop using the Products remains chronically challenged is the fact that D.P. is and was a "video gaming addict" and thus exhibits compulsive, obsessive, and addictive behavior in their use of the Products, an addiction proximately caused by Defendants' deceptive tactics and fueled by the absence of parental controls and time-limit restrictions within the Products, design features that gave the false appearance to Plaintiff D.P.'s caretakers that D.P. was playing far less than D.P. actually was, and, finally, the Defendants' resolve to not provide a warning to D.P.'s caretakers so as to disclose the addictive operant conditioning design incorporated into the Products and as a result stripped D.P.'s caretakers from a meaningful opportunity to make an informed decision regarding the risks of using the Products.

231.    Plaintiff spends an equal if not more time using the Defendants' Products than D.P. engages in most all other activities, including sleeping, socializing, spending time with their family, receiving educational instruction, playing sports, or engaging in any other activity. D.P. fails to engage in other activities, all to the severe and long-lasting detriment to D.P.'s cognitive development, social development, and ability or desire to maintain good grades and maintain appropriate social and emotional development milestones. Plaintiff D.P. continues to chronically struggle with a disordered compulsion and addiction to using the Products and continues to structure and manipulate their behaviors and activities around maintaining access to using the Products.

232.    Plaintiff's use of each of the Defendants' Products was and/or is compulsive and disordered. Plaintiff has been unable to stop using the Products because of the addictive design of the games. D.P.'s family was unaware that Defendants' Products used behavior modification techniques to encourage compulsive use and did not know these features could cause long-term harm.

233.    Plaintiff was injured and harmed as a direct and proximate result of each Defendant's actions, omissions, and misconduct, and is therefore entitled to compensation and other relief under California law.

234.    Each Defendant has engaged in deceptive, unfair, immoral, and reckless conduct that led to Plaintiff's video game addiction and resulting physical, psychological, and emotional harm. For this, they should be punished, and punitive damages should be assessed against each Defendant for their respective misdeeds and unlawful conduct.

235.    Plaintiff's claims are timely under the applicable statutes of limitations because Plaintiff and/or Plaintiff's caretakers did not discover, and could not have reasonably discovered, the dangerous nature of Defendants' Products or the causal link between those products and their injuries. Defendants knowingly failed to warn of the dangers of their products, including their use of operant conditioning behavior modification systems, lack of safety features, and the risks of developing video game addiction or IGD.

236.    In addition, all Defendants are estopped from relying on any statutes of limitations or repose by virtue of their acts of fraudulent concealment, affirmative misrepresentations and omissions, which include Defendants' intentional concealment from Plaintiff, Plaintiff's caretakers,

and the general public that Defendants' Products were defective, unreasonably dangerous, and their use carried with it the serious risk of developing the injuries Plaintiff has suffered, while aggressively and continually marketing and promoting their Products. This includes, but is not limited to, Defendants' failure to disclose and warn of the use of operant conditioning behavior modification systems, lack of adequate safety features, and the risk of video game addiction and/IGD known by each of the Defendants to result from use of their Products, for example, and not by way of limitation, reports and studies finding an increased risk of disordered or addictive behavior with respect to video games and the corresponding physical and psychological injuries, suppression of information about these risks and injuries from the public – including Plaintiff and/or Plaintiff's caretakers – and from treating physicians and mental health providers; use of sales and marketing documents and information that contained information contrary to the internally held knowledge regarding the aforesaid risks and injuries; and overstatement of the safety of each of the Defendants' Products.

237.    Each of the Defendants had a duty to disclose that their Products were defective and unreasonably dangerous, including but not limited to the use of operant conditioning behavior modification systems and the lack of adequate safety features, and the risks associated with their use (including but not limited to video game addiction and IGD); their use carried with it the serious risk of developing the injuries Plaintiff has suffered and Plaintiff complained of herein. Defendants breached that duty.

238.    Plaintiff, Plaintiff's caretakers, and the general public had no knowledge of, and no reasonable way of discovering, the defects found in each of the Defendants' Products or the true risks associated with their use at the time Plaintiff used each of the Defendants' Products.

239.    Each of the Defendants did not notify, inform, or disclose to Plaintiff, Plaintiff's caretakers, and the general public that each of the Defendants' Products were defective, including the use of operant conditioning behavior modification systems and lack of adequate safety features, unreasonably dangerous, and that their use carried with it the serious risk of developing the injuries Plaintiff has suffered and Plaintiff complained of herein.

240.    Because each of the Defendants failed in their duty to notify Plaintiff, Plaintiff's caretakers and the general public that their Products were defective, including the use of operant

conditioning behavior modification systems and lack of adequate safety features, unreasonably dangerous, and that their use carried with it the serious risk of developing the injuries Plaintiff has suffered and complained of herein, and further, actively attempted to conceal this fact, Defendants should be estopped from asserting defenses based on statutes of limitation or repose, including but not limited to under any theories of equitable or other tolling.

241.    Accordingly, Plaintiff files this lawsuit within the applicable statutes of limitations. Plaintiff and/or Plaintiff's caretakers could not by exercise of reasonable diligence have discovered any wrongdoing, nor could he have discovered the causes of her injuries at an earlier time, and when these injuries were discovered, their causes were not immediately known or knowable based on the lack of necessary information, which was suppressed by each of the Defendants.

242.    Further, the relationship of Plaintiff's injuries to exposure to each of the Defendants' Products, including but not limited to each of the Defendants' use of operant conditioning behavior modification systems and lack of adequate safety features, was inherently difficult to discover, in part due to each of the Defendants' knowing suppression of important safety and risk information, and Plaintiff and/or Plaintiff's caretakers had no actual or constructive knowledge of the relationship between these injuries and use of each of the Defendants' Products. Consequently, the discovery rule, and tolling arising from each of the Defendants' fraudulent concealment should be applied to toll the running of the statutes of limitations until Plaintiff discovered, or by the exercise of reasonable diligence should have discovered, that Plaintiff may have a basis for an actionable claim.

243.    Plaintiff's injuries were latent, unknown, or otherwise undiscoverable as they were disguised by each of the Defendants' suppression of the relationship between these injuries and the use of each of the Defendants' Products and other potential causes of Plaintiff's injuries in users such as Plaintiff.

244.    Plaintiff is a lay person that was, until recently, unaware that exposure to each of the Defendants' Products, especially their use of operant conditioning behavior modification systems and lack of adequate safety features, could cause video game addiction and/or IGD and corresponding physical and psychological injuries.

///

245.    Plaintiff and/or Plaintiff's caretakers were unaware of any associations between exposure to each of the Defendants' Products, including their use of operant conditioning behavior modification systems and lack of adequate safety features, being made in the media or other avenues of public discourse.

246.    During Plaintiff's consultations with their healthcare providers and others, Plaintiff's injuries were not related to exposure to each of the Defendants' Products, including their use of operant conditioning behavior modification systems and lack of adequate safety features.

**K.  NO CONTRACT**

247.    Neither the Plaintiff nor any of their caretakers knew that Defendants' Products were and are designed to be addictive and would likely harm a child if used as intended by Defendants; Plaintiff nor anyone else agreed for Plaintiff to be harmed or exposed to addictive products. Plaintiff was incapable of entering into a contract with any of the Defendants' and/or to the extent any of the Defendants' claim Plaintiff or anyone else attempted to accept an electronic term and condition clause on Plaintiff's behalf by clicking buttons on a screen that reflected language Plaintiff. nor any anyone else understood, read, or which were unconscionable, it has since been voided by virtue of its unconscionability and the power of disaffirmance which is demonstrated and secured by the filing of the instant Complaint and, in addition the following statement: Plaintiff, a minor child, lacks capacity to contract and expressly disaffirms any agreement Plaintiff may have accepted through the accounts Plaintiff uses the Products at issue, and does not and did not consent to arbitrate any of the claims in this action and disaffirms the entirety of any user agreement, contract, or other agreement that was accepted through Defendants account(s) relevant to this action.

248.    Plaintiff's continued use of the Defendants' Products, even after the filing of the instant Complaint, to the extent there is such use, is compulsive and due to Plaintiff's disordered compulsion and addiction to using the Products and cannot and does not serve as an affirmation of any contract, however hypothetical, between the Parties, nor does it serve as ratification of any agreement or contract given that Plaintiff is still of minor age.

249.    Moreover, each of the Defendants' terms of services or terms and conditions document is a contract of adhesion that has no variation or negotiable terms prior to requiring signing between

and by the parties. Said terms of services and conditions unilaterally hinge the user's access to the Products on accepting the terms and conditions such that failure or refusal by users to accept and to continue to accept any new terms and conditions during the course of using the Products results in a loss of access to the purchased products. Accordingly, any terms to which Plaintiff may have agreed prior to using any of the Defendants' Products are void and unenforceable. Moreover, because the Defendants' Products were designed to and did cause Plaintiff to develop an addiction or disordered compulsion to using the Products, which in turn proximately caused their mental and physical injuries and damages as herein alleged, any such terms and conditions and any other purported contract or agreement between the Parties to this Complaint are void as against public policy as an individual cannot consent to harming a minor.

## V.    PLAINTIFF'S CLAIMS

### COUNT 1 – STRICT PRODUCT LIABILITY – DESIGN DEFECT

### (Against All Defendants)

250.    Plaintiff realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

251.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, selling, and/or otherwise distributing their respective video game Products used by Plaintiff, each of which are defective and unreasonably dangerous due to operant conditioning which assured video game addiction would occur in users, including minors, as well as the lack of necessary safeguards.

252.    The video game Products that each Defendant placed into the stream of commerce were defectively designed. The Products were designed to cause addictive and compulsive use, including by minors and young adults. The Products are not reasonably fit, suitable, or safe for their intended purpose of playing a game without operant conditioning.

253.    The defective conditions of Roblox and Minecraft rendered them unreasonably dangerous and/or not reasonably safe. The inclusion of operant conditioning to increase continuous game play was concealed from parents, players, and schools. The resulting probability and

seriousness of harm was unethical and occurred without any disclosure of the risks. The burden of informing the public at large that operant conditioning was being utilized, thereby facilitating informed decisions about use of the product and consent to allowing operant conditioning behavior modification systems, is not a high burden and, furthermore, is mandated for the licensed psychologists who were employed by Defendants.

254.    The defects in each Defendant's respective designs were present in the Products when the Products left the hands of Defendants and when they were released to the general public to be used in an intended and foreseeable manner with concealment of the operant conditioning.

255.    Roblox and Minecraft, as designed, were unreasonably dangerous, posed a substantial likelihood of harm, and were therefore defective because of the reasons enumerated in this Complaint, including, but not limited to, each Product's design including addictive operant conditioning, each Product's design lacking warnings about the risk of addiction, each Product's design lacking safeguards such as user-imposed time restrictions on gameplay, each Product's design lacking proper minor age verification, and each Product failing to operate as a reasonable user would expect.

256.    Plaintiff and/or Plaintiff's caretakers were never made aware of the fact that operant conditioning was used in Minecraft and Roblox and did not agree to having such behavior modifications used on Plaintiff. As to any "Use" agreement of playing a video game that any Defendant claims exists with Plaintiff, Plaintiff rejects this argument based upon lack of informed consent to allow operant conditioning to be used on him.

257.    Each Defendant designed its Products to be addictive and take advantage of the concealed use of operant conditioning and the chemical reward system of users' brains to establish compulsive use and addiction.

258.    Each Defendant's respective Products were expected to and did reach Plaintiff without substantial change in the condition in which they were designed, manufactured, labeled, marketed, promoted, supplied, and otherwise released into the stream of commerce.

259.    Plaintiff used Defendants' Products, Roblox and Minecraft, in an intended and reasonably foreseeable manner, and the Products were not materially altered prior to their use. Defendants' Products reached Plaintiff without substantial change to them.

260.     Each Defendant knew or, by the exercise of reasonable care, should have known that users, including Plaintiff, would use the Products without anyone inspecting the Products for addictive or other dangerous features.

261.     Each Defendant's respective Products were defective and were a substantial factor in causing Plaintiff's injuries and harm.

262.     Reasonable users of Defendants' Products would not expect, and Plaintiff did not expect, that said Products would pose risks of severe video game addiction and the corresponding sequelae of physical and psychological injury, including but not limited to low self-esteem, depression, anxiety, pain, functional neurological symptoms, and social isolation.

263.     Reasonable users of Defendants' Products would not expect that Defendants would conceal the operant conditioning, risks of video game addiction, and sequalae of that addiction, but Defendants nevertheless chose to place their Products into the stream of commerce while knowing of both the concealment and risk of harm.

264.     Each Defendant could have completely avoided the harm by not utilizing operant conditioning in game design, provided proper game time tracking and a design to limit game play while still providing an optimal gaming experience.

265.     At the time each Defendant's Products were designed, developed, distributed to Plaintiff, and played, safer alternative designs existed that were entirely feasible.

266.     Each Defendant could have utilized cost effective, reasonably feasible alternative designs to minimize harm caused by their respective Products by implementing elements that include, but are not limited to:

    a.     Warnings of the use of operant conditioning behavior modification systems;

    b.     Lack of informed consent to operant conditioning;

    c.     Robust age verification;

    d.     Effective parental controls;

    e.     The removal of barriers to the enactment of parental controls;

    f.     Warnings of health effects of use and extended use upon sign-up;

    g.     Opt-in restrictions to the length and frequency of sessions;

h.    Self-limiting tools, including but not limited to session time notifications, warnings, or reports.

i.    Tools to restrict and/or block usage during certain times of day (such as during school hours or late at night);

j.    Self-imposed limits for microtransactions; and

k.    Others as set forth herein.

267.    Instead, each Defendant designed their respective Products to aggressively addict users with operant conditioning aimed to increase use time, frequency of use, and profit to each Defendant, all to the detriment of users' wellbeing.

268.    At all relevant times hereto, each Defendant is, and has been, vicariously responsible for the actions and omissions of its agents, servants, contractors, and employees acting within the course and scope of their respective agencies and employment relationships.

269.    Each Defendant's respective defective Product, and Plaintiff's use of each Defendant's Product, was the direct and proximate cause of Plaintiff's injuries and harm that include, but are not limited to, psychological injury, emotional distress, diminished social interactions, lack of interest in other hobbies, and withdrawal symptoms such as rage, anger, physical outbursts, depression, low self-esteem, and pain.

270.    Plaintiff's injuries—physical, emotional, and economic—were reasonably foreseeable to Defendants at the time of the Products' design, marketing, distribution, and operation.

271.    As a direct and proximate result of each Defendant's defective products, Plaintiff developed video game addiction and compulsive gaming behavior, which caused physical, psychological, emotional, and economic harm.

272.    Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff's rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

///

///

1

2

## COUNT 2 – STRICT PRODUCT LIABILITY – FAILURE TO WARN

### (Against All Defendants)

3      273.      Plaintiff realleges and incorporates by reference all the foregoing allegations of every

4      paragraph of this Complaint as if repeated in full here.

5      274.      At all relevant times, each Defendant was engaged in the business of designing,

6      developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising,

7      promoting, controlling, supplying, leasing, selling, and/or otherwise distributing their respective

8      video game Products used by Plaintiff, each of which are defective and unreasonably dangerous due

9      to operant conditioning built into the games to ensure continuous video game play leading to video

10     game addiction and the sequelae of that addiction.

11     275.      Defendants knew that their respective Products concealed the built-in operant

12     conditioning, rendering the games unreasonably dangerous, harmful, capable of causing—and in fact

13     were designed to cause—compulsive, addictive use, particularly in minors, and that such use could

14     result in severe physical, mental, and emotional injuries.

15     276.      Defendants knew, or should have known, that ordinary consumers such as Plaintiff

16     would not have realized the potential risks of their Products nor been capable of knowing that operant

17     conditioning was being used on players in the games.

18     277.      Defendants knew, or should have known, that the use of Roblox and Minecraft was

19     dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner.

20     278.      Each Defendant owed a duty to warn consumers of the foreseeable risks and dangers

21     of their respective Products that Defendants knew were present, but not obvious or known to users,

22     especially underage users, their caregivers, or any average member of the consuming public.

23     279.      At the time Defendants' Products left Defendants' control, they did not include—nor

24     have they ever included—warnings that the Products pose an unreasonable risk of harm to users,

25     particularly minors. The inclusion of operant conditioning to increase continuous gameplay was

26     concealed from parents, players, and schools. The resulting probability and seriousness of harm was

27     unethical and void of any disclosure of the risks. The burden of informing the public at large that

28     operant conditioning was being utilized, thereby facilitating informed decisions about use of the

product and consent to allowing operant conditioning behavior modification systems, is not a high burden and, furthermore, is mandated for the licensed psychologists who were employed by Defendants.

280.　　Each Defendant failed to provide timely and adequate warnings, instructions, and information by, including but not limited to:

　　a.　　Warnings of the use of operant conditioning behavior modification systems;

　　b.　　lack of informed consent to operant conditioning in the games;

　　c.　　failing to warn users, parents and schools that operant conditioning was used in the games;

　　d.　　failing to ensure the Products included warnings regarding their addictive design that were accurate, conspicuous, and adequate, despite having extensive knowledge of the risks associated with their use;

　　e.　　failing to conduct adequate pre-and-post-market safety testing such that an adequate warning could have been issued to users;

　　f.　　failing to include adequate and conspicuous warnings that would alert users to the dangerous risks of the Products, including but not limited to the risks of causing severe and life-altering physical, mental, and emotional disorders and behaviors in minors, especially those with neurodivergent qualities;

　　g.　　failed to issue warnings to consumers regarding the dangerous risks of the Products even after the sale and/or download of their Products; and

　　h.　　representing that the Products were and are safe for use, when in fact, Defendants knew or should have known that their Products were designed to cause minors to engage in excessive use until they developed an addiction or disordered compulsion to use the Products.

281.　　Moreover, each Defendant's non-feasance, failure to act, and omissions in the development, set up, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of their respective Products rendered the product unreasonably dangerous. Those failures include but are not limited to:

a.    Incorporating operant conditioning into the infrastructure of game play to reward continuous video game play;

b.    designing the Products to be more addictive and to target specific individuals based on information obtained and retained by Defendants and/or third parties;

c.    failing to implement effective parental controls;

d.    failing to implement reasonably available means for users or their parents to monitor for and limit or deter their own excessive frequency or duration of use of Products, including patterns, frequency, or duration of use that are indicative of addiction, compulsive use, or overuse;

e.    failing to implement reasonably available means to monitor for and limit or deter excessive overspending by minors on in-game downloadable Products and upgrades and in-game purchases and/or microtransactions; and

f.    failing to implement reasonably available means to allow users or their parents to limit or deter use of Products by minors during ordinary times for school or sleep.

282.    Each Defendant's failure to adequately warn about its defective Product created a danger of injuries described herein that were reasonably foreseeable at the time of the design, development, and dissemination of the Product.

283.    At all relevant times hereto, each Defendant is, and has been, vicariously responsible for the actions and omissions of its agents, servants, contractors, and employees acting within the course and scope of their respective agencies and employment relationships.

284.    A reasonable company under the same or similar circumstances would have warned and instructed Plaintiff of the dangers of its Product.

285.    Had Plaintiff been aware that the Products could cause significant harm, including an increased risk of suicide and severe mental health effects, he would not have used or continued to use each Defendant's respective Product. Alternatively, had Defendants adequately warned or instructed Plaintiff, he would have taken precautions when using each Defendant's respective Product in order to eliminate or mitigate the risk of harm.

///

286.    The addictive nature of each Defendant's defective Product and failure to warn about said Products actually and proximately caused Plaintiff's video game addiction, compulsiveness, and resulting physical, psychological, emotional and economic harm.

287.    Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for Plaintiff's rights and wellbeing, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

## COUNT 3 – NEGLIGENCE – DESIGN

### (Against All Defendants)

288.    Plaintiff realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

289.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, selling, and/or otherwise distributing their respective video game Products used by Plaintiff, each of which are defective and unreasonably dangerous.

290.    Defendants knew, or should have known, that the use of Roblox and Minecraft was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner.

291.    Defendants knew, or should have known, that ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Roblox and Minecraft.

292.    Each Defendant owed a duty to all reasonably foreseeable users to design a safe Product.

293.    Roblox and Minecraft, as designed, were unreasonably dangerous, posed a substantial likelihood of harm, and were therefore defective because of the reasons enumerated in this Complaint, including, but not limited to, each Product's design including addictive operant conditioning, each Product's design lacking warnings about the risk of addiction, each Product's design lacking safeguards such as user-imposed time restrictions on gameplay, each Product's design lacking proper age verification, and each Product failing to operate as a reasonable user would expect.

///

294.    Defendants breached their duty by failing to use reasonable care in the design of their Products by negligently designing Roblox and Minecraft to specifically appeal to and take advantage of users, including minors and vulnerable individuals such as Plaintiff, who were particularly unable to appreciate the risks of the Products.

295.    Defendants breached their duty by failing to use cost effective, reasonably feasible alternative designs that would make their Products less addictive and harmful to minors, including but not limited to:

a.    Warnings of the use of operant conditioning behavior modification systems;

b.    lack of informed consent to operant conditioning being used in the game;

c.    Robust age verification;

d.    Effective parental controls;

e.    The removal of barriers to the enactment of parental controls;

f.    Warnings of health effects of use and extended use upon sign-up;

g.    Opt-in restrictions to the length and frequency of sessions;

h.    Self-limiting tools, including but not limited to session time notifications, warnings, or reports;

i.    Tools to restrict and/or block usage during certain times of day (such as during school hours or late at night);

j.    Self-imposed limits for microtransactions; and

k.    Others as set forth herein.

296.    Instead, each Defendant designed their respective Products to aggressively addict users with features that increase use time, frequency of use, and profit to each Defendant, all to the detriment of users' wellbeing.

297.    At all relevant times hereto, each Defendant is, and has been, vicariously responsible for the actions and omissions of its agents, servants, contractors, and employees acting within the course and scope of their respective agencies and employment relationships.

298.    Each Defendant further breached their duty of care by inducing, promoting and otherwise facilitating the use of operant conditioning behavior modification systems on minors

without adequate warning or informed consent and by inducing, promoting and otherwise facilitating psychological professionals to violate their applicable standards of care, including but not limited to the APA Code of Conduct, in the development and promotion of Defendants' Products.

299.    A reasonable company under the same or similar circumstances would have designed a safer product.

300.    Plaintiff was harmed directly and proximately by each Defendant's failure to use reasonable care in the design of its Product.

301.    As a direct and proximate result of each Defendant's negligence, Plaintiff developed video game addiction and compulsive gaming behavior, which caused physical, psychological, emotional, and economic harm.

302.    Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for Plaintiff's rights and well-being, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

### COUNT 4 -NEGLIGENT FAILURE TO WARN

### (Against All Defendants)

303.    Plaintiff realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

304.    At all relevant times, Defendants designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and/or benefited from the Products and platforms that Plaintiff used.

305.    Defendants knew, or should have known, that the use of their Products was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner.

306.    Each Defendant knew or, by the exercise of reasonable care, should have known that its respective Products posed risks of harm to users, particularly youth. These risks were known and knowable considering each Defendant's own internal information and knowledge regarding its Products at the time of the Products' development, design, marketing, promotion, advertising, and distribution to Plaintiff.

307.    Defendants knew, or should have known, that ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Defendants' Products. Minecraft and Roblox are highly addictive and likely to cause physical, mental, and emotional injuries as listed above.

308.    None of Defendants' Products, as identified herein, contain a warning, nor have they ever contained a warning, that their Products contained operant conditioning to elicit continuous video game play which poses an unreasonable risk of harm and addiction to users, particularly minors. Defendants' Products did not contain a warning when the Products left their possession.

309.    Had Plaintiff and/or Plaintiff's caretakers received adequate warning about the risks of Defendants' Products, they would have heeded such warnings.

310.    At all relevant times hereto, each Defendant is, and has been, vicariously responsible for the actions and omissions of its agents, servants, contractors, and employees acting within the course and scope of their respective agencies and employment relationships.

311.    Each Defendant had a duty to give reasonable and adequate warning of dangers inherent or reasonably foreseeable in the use of its Product in a manner which the manufacturer should reasonably foresee.

312.    Defendants breached their duties owed to foreseeable users. That breach includes a failure to warn users that Defendants' respective Products cause addiction, compulsive use, and/or other physical, mental, emotional, and developmental delay injuries, including an increased risk of suicidality.

313.    Each Defendant further breached their duty of care to foreseeable users by inducing, promoting and otherwise facilitating the use of operant conditioning behavior modification systems on minors without adequate warning or informed consent and by inducing, promoting and otherwise facilitating psychological professionals to violate their applicable standards of care, including but not limited to the APA Code of Conduct, in the development and promotion of Defendants' Products.

314.    Each Defendant breached their duty of care by actively working to suppress diagnosis and treatment of video game addiction.

///

315.     A reasonable company under the same or similar circumstances would have used reasonable care to provide adequate warnings to consumers.

316.     As a direct and proximate result of Defendants' breach of duty to provide adequate warnings, Plaintiff was harmed and sustained the injuries set forth herein.

317.     As a direct and proximate result of each Defendant's material misrepresentation and false statements, Plaintiff suffered video game addiction, compulsiveness, and resulting physical, psychological, emotional and economic harm.

318.     Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for Plaintiff's rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

## COUNT 5 – NEGLIGENCE – ORDINARY

### (Against All Defendants)

319.     Plaintiff realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

320.     Defendants had a duty to exercise reasonable care and caution for the safety of individuals using their Products, including Plaintiff.

321.     Defendants, in their role as product designers, developers, manufacturers, marketers, and sellers, and otherwise engaging in activity culminating in placing their Products into the stream of commerce, owed a duty to exercise ordinary care in designing and placing the Products into the stream of commerce. The inclusion of operant conditioning to increase continuous game play was concealed from users, parents, and schools. The resulting probability and seriousness of harm was unethical and void of any disclosure of the risks. The burden of informing the public at large that operant conditioning was being utilized, thereby facilitating informed decisions about use of the product and consent to allowing operant conditioning behavior modification systems, is not a high burden and, furthermore, is mandated for the licensed psychologists who were employed by Defendants.

///

- 58 -

322.     Defendants also owed a duty to warn users of the hazards of using their Products, which Defendants knew were present in their Products, though such hazards were not obvious to users and particularly not so to minor users.

323.     Defendants' duties also include a duty to exercise ordinary care and act as a reasonably careful company would under the circumstances.

324.     At all relevant times hereto, each Defendant is, and has been, vicariously responsible for the actions and omissions of its agents, servants, contractors, and employees acting within the course and scope of their respective agencies and employment relationships.

325.     Each Defendant created harmful and addictive Products and failed to engage in the development of safer alternative designs.

326.     For their own profit, each Defendant affirmatively chose not to engage in the development of a safer alternative designs.

327.     Each Defendant was negligent, reckless, and/or careless in failing to exercise ordinary care.

328.     Defendants' failure to act in developing a safer alternative designs constitutes a breach of their duty of reasonable care.

329.     Defendants knew, or should have known, that their Products are harmful, capable of causing extensive physical, mental, emotional, and financial or economic harm and damage, and that minor users are developing disordered and addicted use.

330.     Defendants were and are negligent in failing to provide adequate warnings about the dangers associated with using their Products and in failing to warn users, and the parents of users who are minors, including Plaintiff, about how and when, if ever, to safely use their Products.

331.     Defendants were and are negligent in failing to provide users, and their caregivers in the case of users who are minors, including Plaintiff, the tools to ensure that their Products are used in a limited and safe manner.

332.     Each Defendant was negligent by inducing, promoting and otherwise facilitating the use of operant conditioning behavior modification systems on minors without adequate warning or informed consent and by inducing, promoting and otherwise facilitating psychological professionals

to violate their applicable standards of care, including but not limited to the APA Code of Conduct, in the development and promotion of Defendants' Products.

333.    Each Defendant was negligent by actively working to suppress diagnosis and treatment of video game addiction.

334.    As a result of each Defendant's breach of the herein identified duties and resulting negligence, Plaintiff suffered from video game addiction and related injuries.

335.    Each Defendant's breach of duty of care to Plaintiff was a substantial factor in causing harm to Plaintiff and is the actual and proximate cause of said harm

336.    As a direct and proximate result of Defendants' negligence, Plaintiff suffered from video game addiction and compulsive use, leading to physical, psychological, emotional, and financial harm.

337.    Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff's rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

## COUNT 6 – INTENTIONAL MISREPRESENTATION

### (Against All Defendants)

338.    Plaintiff realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

339.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, selling, and/or otherwise distributing their respective video game Products used by Plaintiff, each of which are defective and unreasonably dangerous due to operant conditioning which ensured continuous video game play and increased the risk of video game addiction.

340.    Defendants knew that the use of their respective Products was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner.

///

341.     Each Defendant knew its respective Products posed risks of harm to users, particularly youth. These risks were known and knowable considering each Defendant's own internal information and knowledge regarding its Product at the time of the Product's development, design, marketing, promotion, advertising, and distribution to Plaintiff. The inclusion of operant conditioning to increase continuous gameplay was concealed from users, parents, and schools. The resulting probability and seriousness of harm was unethical and void of any disclosure of the risks. The burden of informing the public at large that operant conditioning was being utilized—thereby facilitating informed decisions about use of the product and consent to allowing operant conditioning behavior modification systems—is not a high burden and, furthermore, is mandated for the licensed psychologists who were employed by Defendants.

342.     Defendants knew that ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Defendants' Products.

343.     At the time each Defendant's Product left their respective control, the Products did not include—nor have they ever included—warnings that the Products pose an unreasonable risk of harm to users, particularly minors.

344.     Had Plaintiff and/or Plaintiff's caretakers been aware that the Products could cause significant harm including a risk of addiction, compulsive use, and psychological or emotional injury, they would not have used or continued to use each Defendant's respective Product. Alternatively, if Defendants had adequately warned or instructed Plaintiff and/or Plaintiff's caretakers, they would have taken precautions when using each Defendant's respective Product in order to eliminate or mitigate the risk of harm.

345.     At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, selling, and/or otherwise distributing their respective video game Products used by Plaintiff, each of which are defective and unreasonably dangerous due to the concealment of operant conditioning being used in Minecraft and Roblox and the lack of warnings about the risk of addiction.

///

Complaint for Damages

346.    As detailed herein, Defendants knew about the defective conditions of their respective Products and that the Products posed serious health risks to users, particularly minors.

347.    Each Defendant designed their respective Product with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse and compulsive use by youth can lead to injury, but concealed this information from the public and Product users, including Plaintiff.

348.    Each Defendant knew of the risks associated with the use of their respective Products based on internal research and external studies known within the industry.

349.    At all relevant times hereto, each Defendant is, and has been, vicariously responsible for the actions and omissions of its agents, servants, contractors, and employees acting within the course and scope of their respective agencies and employment relationships.

350.    Each Defendant induced, promoted, and otherwise facilitated the use of operant conditioning behavior modification systems on minors without adequate warning or informed consent and included, promoted and otherwise facilitated psychological professionals to violate their applicable standards of care, including but not limited to the APA Code of Conduct, in the development and promotion of Defendants' Products.

351.    Each Defendant actively worked to suppress diagnosis and treatment of video game addiction, contrary to its true occurrence.

352.    Each Defendant could have disclosed the defective condition of their respective Products to the public and could have advised that the Products posed serious health risks to users, particularly youth. No Defendant took such action; instead, each Defendant opted to omit the safety risks from any disclosures or marketing practices. The inclusion of operant conditioning to increase continuous gameplay was concealed from users, parents, and schools. The resulting probability and seriousness of harm was unethical and void of any disclosure of the risks. The burden of informing the public at large that operant conditioning was being utilized, thereby facilitating informed decisions about use of the product and consent to allowing operant conditioning behavior modification systems, is not a high burden and, furthermore, is mandated for the licensed psychologists who were employed by Defendants.

353.     Each Defendant knowingly and intentionally misrepresented that their respective Products were safe for use, and safe as educational tools, to further entice users to continue engaging with their respective Products, including Plaintiff, while simultaneously knowing that their respective Products each caused addiction and compulsive use.

354.     Defendants Microsoft and Mojang stated that they will "hold [them]selves accountable for making Minecraft as safe as possible for everyone." Defendants Microsoft and Mojang further state that it is "so important that [their] games are a safe and welcoming place for all players," that "player safety is a priority for Mojang to ensure everyone feels safe," and that their "community standards help [them] build a community that is open and safe for everyone."

355.     Each Defendant's statements about the safety of their respective Products are false and misleading, and each Defendant's omission of the potential harm caused by Defendants' respective Products is misleading and deceitful.

356.     Each Defendant intended for users, including Plaintiff, to rely on their representations that their respective Products were safe for use to keep users engaging with their Products and increase their profits, and purposefully marketed their Products to minors for that reason. Each Defendant's representations about safety were material in keeping users engaged with their Products and to increase their profits.

357.     However, each Defendant had no reasonable grounds to believe that their respective Products were safe given the internal and external research on addiction associated with video game use and given the global recognition of video game addiction. Each Defendant knowingly made false statements about the safety of their respective Products.

358.     Each Defendant failed to disclose to users, including Plaintiff, that their Products are designed to create and sustain addiction.

359.     Each Defendant intentionally failed to disclose to users the strategies and features designed and employed in their Products to create and sustain addiction.

360.     Each Defendant intentionally failed to disclose their addictive strategies and features to entice users to continue gameplay and increase profits.

///

361.      If each Defendant had not concealed, omitted, and misrepresented facts regarding the safety of their Products, and had Plaintiff and/or Plaintiff's caretakers been aware that the Products could cause significant harm such as increased risk of suicide, brain damage, psychological injury, aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, and behavioral addiction disorders, Plaintiff would not have used or continued to use each Defendant's respective Product. Alternatively, if Defendants had adequately warned or instructed Plaintiff and/or their guardian, they would have taken precautions when using each Defendant's respective Product in order to eliminate or mitigate the risk of harm.

362.      Plaintiff and/or Plaintiff's caretakers were unaware of the dangerous and addictive nature of Defendants' Products. Plaintiff and/or Plaintiff's caretakers reasonably relied on each Defendant's representations that its respective Product was safe for use, particularly for minors.

363.      Plaintiff and/or Plaintiff's caretakers reasonably relied on each Defendant's representations and did not know, nor had any way of knowing, about the misrepresentations concerning Defendants' Products.

364.      A reasonable person, including Plaintiff, would find information that impacted the users' health, safety, and well-being – such as the serious adverse health risks associated with the use of Defendants' Products – to be important when deciding whether to purchase, download, use, or to continue to use those Products. Thus, Plaintiff and/or Plaintiff's caretakers justifiably relied on each Defendant's misrepresentations that the Products were safe when purchasing, downloading, playing, continuing to use, and/or purchasing downloadable game content.

365.      Because of Plaintiff's and/or Plaintiff's reasonable reliance on each Defendant's representations, Plaintiff sustained physical and psychological harm, as well as economic damages.

366.      As a direct and proximate result of each Defendant's decision to not provide adequate warnings, Plaintiff was harmed and sustained the injuries set forth herein.

367.      As a direct and proximate result of each Defendant's misconduct, Plaintiff suffered video game addiction, compulsiveness, and resulting physical, psychological, emotional and economic harm.

///

368.     As a direct and proximate result of each Defendant's material misrepresentations and false statements, Plaintiff suffered video game addiction, compulsiveness, and resulting physical, psychological, emotional and economic harm.

369.     Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff's rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

## COUNT 7 – NEGLIGENT MISREPRESENTATION

### (Against All Defendants)

370.     Plaintiff realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

371.     At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, selling, and/or otherwise distributing their respective video game Products used by Plaintiff, each of which are defective and unreasonably dangerous due to the concealment of operant conditioning being used in Minecraft and Roblox with the behavioral goal of continuous video game play and increased risk of video game addiction.

372.     Defendants knew, or should have known, that the use of their respective Products was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner.

373.     Each Defendant knew or, by the exercise of reasonable care, should have known that its respective Products posed risks of harm to users, particularly youth. These risks were known and knowable considering each Defendant's own internal information and knowledge regarding its Product at the time of the Product's development, design, marketing, promotion, advertising, and distribution to Plaintiff. The inclusion of operant conditioning to increase continuous gameplay was concealed from users, parents, and schools. The resulting probability and seriousness of harm was unethical and void of any disclosure of the risks. The burden of informing the public at large that operant conditioning was being utilized—thereby facilitating informed decisions about use of the product and consent to allowing operant conditioning behavior modification systems—is not a high

burden and, furthermore, is mandated for the licensed psychologists who were employed by Defendants.

374.    Defendants knew, or should have known, that ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Defendants' Products.

375.    At the time each Defendant's Product left their respective control, the Products did not include—nor have they ever included—warnings that the Products pose an unreasonable risk of harm to users, particularly minors.

376.    Had Plaintiff and/or Plaintiff's caretakers been aware that the Products could cause significant harm including a risk of addiction, compulsive use, and psychological or emotional injury, he would not have used or continued to use each Defendant's respective Product. Alternatively, if Defendants had adequately warned or instructed Plaintiff and/or Plaintiff's caretakers, they would have taken precautions when using each Defendant's respective Product in order to eliminate or mitigate the risk of harm.

377.    Each Defendant had a duty to give reasonable and adequate warning of dangers inherent or reasonably foreseeable in the use of its Product in a manner which the manufacturer should reasonably foresee.

378.    Defendants breached their duties owed to foreseeable users. That breach includes a failure to warn users that Defendants' respective Products cause addiction, compulsive use, and/or other physical and mental injuries.

379.    A reasonable company under the same or similar circumstances would have exercised reasonable care by providing adequate warnings to consumers about the addictive design and potential physical and psychological harms associated with their products.

380.    As detailed herein, Defendants knew about the defective conditions of their respective Products and that the Products posed serious health risks to users, particularly minors.

381.    Each Defendant designed their respective Product with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse and compulsive use by youth can lead to injury, but concealed this information from the public and Product users, including Plaintiff and/or Plaintiff's caretakers.

382.    Defendants knew of the risks associated with the use of their Products based on internal research and external studies known within the industry.

383.    Each Defendant could have disclosed the defective condition of their respective Products to the public and could have advised that the Products posed serious health risks to users, particularly youth. No Defendant took such action; instead, each Defendant opted to omit the safety risks from any disclosures or marketing practices.

384.    Defendants knowingly and negligently misrepresented that their Products were safe for use, and safe as an educational tool, to further entice users to continue engaging with their Products, including Plaintiff, while simultaneously knowing that their respective Products each caused addiction and compulsive use.

385.    Defendants Microsoft and Mojang stated that they will "hold [them]selves accountable for making Minecraft as safe as possible for everyone." Defendants Microsoft and Mojang further state that it is "so important that [their] games are a safe and welcoming place for all players," that "player safety is a priority for Mojang to ensure everyone feels safe," and that their "community standards help [them] build a community that is open and safe for everyone."

386.    Each Defendant's statements about the safety of their respective Products are false and misleading, and each Defendant's omission of the potential harm caused by Defendants' respective Products is misleading and deceitful.

387.    Each Defendant intended for users, including Plaintiff, to rely on their representations that their respective Products were safe for use to keep users engaging with their Products and increase their profits, and purposefully marketed their Products to minors for that reason. Each Defendant's representations about safety were material in keeping users engaged with their Products and to increase their profits.

388.    However, each Defendant had no reasonable grounds to believe that their respective Products were safe given the internal and external research on addiction and given the global recognition of video game addiction. Each Defendant made false statements about the safety of their respective Products.

///

389.    Defendants failed to disclose to users, including Plaintiff, that their Products are designed to create and sustain addiction.

390.    Defendants failed to disclose to users the strategies and features designed and employed in their Products to create and sustain addiction.

391.    Defendants failed to disclose their addictive strategies and features to entice users to continue gameplay and increase profits.

392.    At all relevant times hereto, each Defendant is, and has been, vicariously responsible for the actions and omissions of its agents, servants, contractors, and employees acting within the course and scope of their respective agencies and employment relationships.

393.    Each Defendant induced, promoted, and otherwise facilitated the use of operant conditioning behavior modification systems on minors without adequate warning or informed consent and induced, promoted and otherwise facilitated psychological professionals to violate their applicable standards of care, including but not limited to the APA Code of Conduct, in the development and promotion of Defendants' Products.

394.    Each Defendant actively worked to suppress diagnosis and treatment of video game addiction, contrary to its true occurrence.

395.    If each Defendant had not concealed, omitted, and misrepresented facts regarding the safety of their Products, and had Plaintiff and/or her guardian been aware that the Products could cause significant harm such as brain damage, psychological injury, aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, increased suicide risk, and behavioral addiction disorders, Plaintiff would not have used or continued to use each Defendant's respective Product. Alternatively, if Defendants had adequately warned or instructed Plaintiff and/or her guardian, they would have taken precautions when using each Defendant's respective Product in order to eliminate or mitigate the risk of harm.

396.    Plaintiff and/or Plaintiff's caretakers were unaware of the dangerous and addictive nature of Defendants' Products. Plaintiff reasonably relied on Defendants' representations that their Products were safe for use.

///

397.    Plaintiff and/or Plaintiff's caretakers reasonably relied on Defendants' representations and did not know, nor had any way of knowing, about the misrepresentations concerning Defendants' Products.

398.    A reasonable person, including Plaintiff, would find information that impacted the users' health, safety, and well-being – such as the serious adverse health risks associated with the use of Defendants' Products – to be important when deciding whether to purchase, download, use, or to continue to use those Products. Thus, Plaintiff and/or Plaintiff's caretakers justifiably relied on each Defendant's misrepresentations that the Products were safe when purchasing, downloading, playing, continuing to use, and/or purchasing downloadable game content.

399.    Because of Plaintiff's and/or Plaintiff's caretakers' reasonable reliance on each Defendant's representations, Plaintiff sustained physical and psychological harm, as well as damages.

400.    Defendants' misrepresentations were a substantial factor in causing harm to Plaintiff, who suffered significant injury, harm, damages, and economic loss, and will continue to suffer such harm, damages, and economic loss in the future. Thus, Plaintiff seeks actual damages according to proof.

## COUNT 8 – FRAUD

### (Against All Defendants)

401.    Plaintiff realleges and incorporates by reference all the foregoing allegations as if repeated in full here.

402.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, selling, and/or otherwise distributing their respective video game Products used by Plaintiff, each of which are defective and unreasonably dangerous due to concealment of operant conditioning being used in Roblox and Minecraft to increase the chances of continuous video game play and thereby also increased the chance of video game addiction.

403.    As detailed herein, each Defendant knew about the defective conditions of its Products and that the Products posed serious health risks to users, particularly minors, young adults, and neurodivergent individuals.

404.    Each Defendant knew their Products posed risks to minors, like Plaintiff, based on internal research and external studies known in the industry and to each Defendant; yet each Defendant misrepresented the safety and value of their games for the purpose of inducing users, like Plaintiff, to purchase/download the game and to continue using Defendants' Products and encourage the addiction knowingly caused by Defendants' Products.

405.    Defendants Microsoft and Mojang stated that they will "hold [them]selves accountable for making Minecraft as safe as possible for everyone." Defendants Microsoft and Mojang further state that it is "so important that [their] games are a safe and welcoming place for all players," that "player safety is a priority for Mojang to ensure everyone feels safe," and that their "community standards help [them] build a community that is open and safe for everyone."

406.    Each Defendant's statements about the safety of their respective Products are false and misleading, and each Defendant's omission of the potential harm caused by Defendants' respective Products is misleading and deceitful.

407.    Each Defendant could have disclosed the defective condition of their Products to the public and could have advised that the Products posed serious health risks to users, particularly youth. No Defendant took such action; instead, each Defendant opted to omit the safety risks from any disclosures or marketing practices.

408.    At all relevant times hereto, each Defendant is, and has been, vicariously responsible for the actions and omissions of its agents, servants, contractors, and employees acting within the course and scope of their respective agencies and employment relationships.

409.    Each Defendant induced, promoted and otherwise facilitated the use of operant conditioning behavior modification systems on minors without adequate warning or informed consent and induced, promoted and otherwise facilitated psychological professionals to violate their applicable standards of care, including but not limited to the APA Code of Conduct, in the development and promotion of Defendants' Products.

410.    Each Defendant actively worked to suppress diagnosis and treatment of video game addiction, contrary to its true occurrence.

///

411.    Defendants knowingly and intentionally misrepresented that their Products were safe for use to further entice users to continue engaging with their Products, including Plaintiff.

412.    Each Defendant intended for users, including Plaintiff, to rely on their representations that their respective Products were safe for use to keep users engaging with their Products and increase their profits, and purposefully marketed their Products to minors for that reason. Each Defendant's representations about safety were material in keeping users engaged with their Products and to increase their profits.

413.    If each Defendant had not concealed, omitted, and misrepresented facts regarding the safety of their Products, and had Plaintiff and/or Plaintiff's caretakers been aware that the Products could cause continuous video game play resulting in significant harm such as video game addiction and the attendant sequelae of lack of prefrontal cortex development in the brain, psychological injury, aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, increased suicide risk, and behavioral addiction disorders, Plaintiff would not have used or continued to use each Defendant's respective Product. Alternatively, if Defendants had adequately warned or instructed Plaintiff and/or Plaintiff's caretakers, they would have taken precautions when using each Defendant's respective Product in order to eliminate or mitigate the risk of harm.

414.    However, each Defendant had no reasonable grounds to believe that their respective Products were safe given the internal and external research on addiction and given the global recognition of video game addiction. Each Defendant knowingly made false statements about the safety of their respective Products.

415.    As a direct and proximate result of each Defendant's material omissions, Plaintiff and/or Plaintiff's caretakers had no reason to believe that each of Defendant's Products were unsafe for children to use.

416.    Plaintiff and/or Plaintiff's caretakers reasonably relied on each Defendant's misrepresentations that each of their Products was safe for use.

417.    A reasonable person, including Plaintiff and/or Plaintiff's caretakers, would find information that impacted the user's health, safety, and well-being – such as the serious adverse health

1  risks associated with the use of Defendants' Products – to be important when deciding whether to

2  purchase, download, use, or to continue to use those Products. Thus, Plaintiff and/or Plaintiff's

3  caretakers justifiably relied on each Defendant's misrepresentations that the Products were safe when

4  purchasing, downloading, playing, continuing to use, and/or purchasing downloadable game content.

5      418.    As a direct and proximate result of each Defendant's material misrepresentations,

6  Plaintiff developed video game addiction and compulsive gaming behavior, which caused physical,

7  psychological, emotional, and economic harm.

8      419.    Each Defendant's actions and omissions as alleged in this Complaint were intentional,

9  oppressive, malicious, reckless, wanton, fraudulent, and beyond all standards of decency,

10  demonstrating a conscious disregard for the rights, health, and safety of consumers like Plaintiff.

11  Accordingly, Plaintiff seeks actual and punitive damages according to proof.

**COUNT 9 – PUNITIVE DAMAGES**

**(Against All Defendants)**

14      420.    Plaintiff realleges and incorporates by reference all the foregoing allegations as if

15  repeated in full here.

16      421.    Plaintiff alleges that Defendants' conduct was undertaken with malice, oppression, or

17  fraud, as described in California Civil Code § 3294.

18      422.    More specifically, Defendant willfully and consciously disregarded the safety and

19  rights of others, engaged in intentional misrepresentation, and conducted themselves in a despicable

20  manner, with knowledge that such acts would likely cause injury, by implementing operant

21  conditioning behavior modification systems while failing to provide

22      a.    Warnings of the use of operant conditioning behavior modification systems;

23      b.    lack of informed consent to operant conditioning being used in the game;

24      c.    Robust age verification;

25      d.    Effective parental controls;

26      e.    The removal of barriers to the enactment of parental controls;

27      f.    Warnings of health effects of use and extended use upon sign-up;

28      g.    Opt-in restrictions to the length and frequency of sessions;

h.      Self-limiting tools, including but not limited to session time notifications, warnings, or reports;

i.       Tools to restrict and/or block usage during certain times of day (such as during school hours or late at night);

j.       Self-imposed limits for microtransactions; and

k.      Others as set forth herein.

423.    As a direct and proximate result of Defendants' egregious conduct in prioritizing profits at the expense of minors with knowledge of the attendant risks and their failure to mitigate those risks, Plaintiff is entitled to an award of exemplary and punitive damages in an amount sufficient to punish Defendants and deter similar conduct in the future. Accordingly, Plaintiff requests punitive damages as permitted by law.

## VI. **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff D.P., for the stated causes of action, prays for judgment against all Defendants as follows:

i.       For damages to be determined by the jury, in an amount exceeding the minimum jurisdictional requirement of this Court, and adequate to compensate Plaintiff for all injuries and damages sustained;

ii.      For all general and special damages caused by the conduct of the Defendants;

iii.     For the costs of litigating this case;

iv.      For all pre-judgment and post-judgment interest;

v.       For Plaintiff's costs of suit herein;

vi.      For Injunctive relief;

vii.     For Attorneys' fees;

viii.    For exemplary and/or punitive damages according to proof at the time of trial; and

///

///

///

ix.    For such other and further relief, whether at law or in equity, to which this Court deems just and proper.

Respectfully submitted, this November 25, 2025

BULLOCK LEGAL GROUP, LLC

*/s/ Anya Fuchs*
Anya Fuchs (CA215105)
Carasusana Wall (OH0090234) (*PHV Forthcoming*)
Tina Bullock (GA121791) (*PHV Forthcoming*)
Ameena Alauddin (OH 102588) (*PHV Forthcoming*)
2000 Powell Street, Suite 825
Emeryville, California 94608
(833) 853-4258
(470) 412-6708 (facsimile)
Anya@bullocklegalgroup.com
cara@bullocklegalgroup.com
tina@bullocklegalgroup.com
ameena@bullocklegalgroup.com
*Counsel for Plaintiff*

## DEMAND FOR JURY TRIAL

The undersigned hereby demands a trial by jury as to all issues so triable.

Respectfully submitted, this November 25, 2025.

BULLOCK LEGAL GROUP, LLC

*/s/ Anya Fuchs*
Carasusana B. Wall (OH0090234) (*PHV Forthcoming*)
Anya Fuchs (CA215105)
Tina Bullock (GA121791) (*PHV Forthcoming*)
Ameena Alauddin (OH 102588) (*PHV Forthcoming*)
2000 Powell Street, Suite 825
Emeryville, California 94608
(833) 853-4258
(470) 412-6708 (facsimile)
anya@bullocklegalgroup.com
cara@bullocklegalgroup.com
tina@bullocklegalgroup.com
ameena@bullocklegalgroup.com
*Counsel for Plaintiff*

Complaint for Damages